STATE OF CONNECTICUT *v.* RAYMOND MARESCA

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and SPEZIALE, Js.

Argued May 5—decision released September 6, 1977

*Howard A. Jacobs,* for the appellant (defendant).

*William F. Gallagher,* special assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *John T. Redway,* assistant state's attorney, for the appellee (state).

LOISELLE, J.   The defendant was convicted of policy playing, in violation of former § 53-298[1] of the General Statutes, and of destruction of property to prevent seizure by a police officer, in violation of § 54-33e of the General Statutes.   At a second trial with a separate jury he was convicted of being a second offender under § 53-298.   Both trials were by juries of six.   He has appealed from the judgment rendered on the verdicts.

I

The defendant claims that his trials by juries of six were in violation of the constitutional prohibition against ex post facto laws, article 1, § 10, of the United States constitution, because at the time that the offenses were alleged to have been committed, the defendant had the right to be tried by a jury of twelve.

Section 54-82 of the General Statutes was amended by 1973 Public Acts, No. 73-576, to provide for juries of six except for capital offenses. The act became effective on passage, June 12, 1973,

---

[1] Repealed by 1973 Public Acts, No. 73-455, § 9.

and applied to all prosecutions claimed for jury trial thereafter. The defendant was charged with crimes committed in December, 1972, but was not put to plea until July 3, 1973. Although he elected to be tried by a jury of twelve in each instance, the court ordered a jury of six.

The United States Supreme Court held in *Thompson* v. *Utah,* 170 U.S. 343, 18 S. Ct. 620, 42 L. Ed. 1061, that a change in the law by the new state of Utah reducing the number of jurors for a trial subsequent to the offense for which the trial was to be held was unconstitutional as an ex post facto law when the offense had been committed while Utah was a territory and subject only to federal law. It concluded (p. 351) that the statute "belongs to that class which by its necessary operation and 'in its relation to the offence, or its consequences, alters the situation of the accused to his disadvantage.' [Citations omitted]." It went on to explain (p. 352) that the legislature might prescribe changes in procedure without violating the prohibition against ex post facto laws, so long as it did not " 'dispense with any of those substantial protections with which the existing law surrounds the person accused of crime.' [Cooley, Constitutional Limitations (6th Ed.) p. 326]." It rejected the argument of the Utah Supreme Court that a jury of eight was as likely to ascertain the truth as one of twelve, for the reason that "the wise men who framed the Constitution of the United States and the people who approved it were of the opinion that life and liberty, when involved in criminal prosecutions, would not be adequately secured except through the unanimous verdict of twelve jurors." Id., p. 353.

In *Beazell* v. *Ohio,* 269 U.S. 167, 46 S. Ct. 68, 70 L. Ed. 216, the United States Supreme Court dealt

with a change in the law which resulted in joint trials of defendants who would otherwise have been entitled to separate trials. The court there held that this was not a violation of article 1, § 10, because "statutory changes in the mode of trial . . . which do not deprive the accused of a defense and which operate only in a limited and unsubstantial manner to his disadvantage, are not prohibited." Id., p. 170.

More recently, the United States Supreme Court has held that a jury of six is not unconstitutional. *Williams* v. *Florida,* 399 U.S. 78, 100, 90 S. Ct. 1893, 26 L. Ed. 2d 446. "To be sure, the number should probably be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide fair possibility for obtaining a representative cross-section of the community. But we find little reason to think that these goals are in any meaningful sense less likely to be achieved when the jury numbers six, than when it numbers 12— particularly if the requirement of unanimity is retained." *Williams* did not expressly overrule the ex post facto portion of the holding of *Thompson* v. *Utah,* supra, but the court removed the underpinnings of the *Thompson* holding when it stated (p. 101) that "neither currently available evidence nor theory suggests the the 12-man jury is necessarily more advantageous to the defendant than a jury composed of fewer members."

Since the *Williams* decision, a jury of twelve is no longer considered a constitutional right, and, as a matter of law, it is not deemed to offer any advantage to the defendant. Nor can it be any longer considered substantial. Thus the statute which diminished the jury's size from twelve to six did not take away a substantial right, but operated

"only in a limited and unsubstantial manner to . . . [the defendant's] disadvantage." *Beazell* v. *Ohio,* supra. It is noteworthy that the Arizona Court of Appeals, when faced with this same question, reached this same conclusion. *State* v. *McIntosh,* 23 Ariz. App. 246, 532 P.2d 188.

## II

At the trial, the state produced evidence which tended to show that on December 6, 1972, detectives approached the defendant's residence, and one saw the defendant through a window using the telephone and writing on a piece of paper, while his wife examined other papers. When the detective knocked on the window, exhibited his badge and a search warrant, and announced that the officers were police with a search warrant, the defendant and his wife grabbed the papers and ran. Two other detectives then forced a door and all three entered the house, where they found the defendant blocking the bathroom door and his wife flushing the toilet. A detective snatched papers from the toilet. The papers had numbers on them which, in the opinion of a member of the gambling division of the New Haven police department, were bets on numbers in a policy lottery.

During the trial on the policy playing and destruction of evidence charges, a detective explained the mechanics of playing policy. He had been warned by the court in advance not to use the words "syndicate," "organized crime," or "Mafia" in his explanation, or to testify that the defendant was part of an "organization." Despite this, when he was asked how policy playing operates, he replied, "You mean, within the organization—I mean, within the policy playing—." The court ordered the reference to

"within the organization" stricken, and instructed the jury to disregard it, but it denied the defendant's motion for a mistrial. The defendant, claiming the court erred in its refusal to grant a mistrial, cites *State* v. *Ferrone,* 97 Conn. 258, 116 A. 336, where evidence was erroneously admitted which suggested that the defendant had just spent seven years in Sing Sing. This court held that striking the testimony and ordering the jury to disregard it was insufficient to cure the error because it tended to prove "that the accused was a notorious criminal," thus prejudicing the jury against him and depriving him of a fair trial. The testimony heard by the jury in this case, however, is not of such proportions. A general description of the way gambling is conducted by some persons does not necessarily imply that the defendant is one of that group, and the form of the response suggests that the witness believed there might be two ways of playing policy—one conducted by "the organization" and the other by different persons. While any testimony tending to show guilt by association is to be excluded, the remedy of striking the reference and instructing the jury to disregard it was sufficient in this case. *State* v. *Ruiz,* 171 Conn. 264, 274, 368 A.2d 222; *State* v. *Rose,* 168 Conn. 623, 634–35, 362 A.2d 813.

One of the detectives who had participated in the search of the defendant's apartment testified that he personally did not seize anything. On cross-examination the defense produced a receipt, signed by him and in his handwriting, for $435 taken from the defendant's address. The detective stated that another detective took the money, but "I was the one who wrote the receipt out." On redirect, the state's attorney established first that the receipt was undated, and then inquired whether it could have

been given to the defendant "on another date," to which, after the defense objected, but before the court ruled, the witness replied, "It's possible." A motion for a mistrial was again denied by the court. The defendant claims that the question called the jury's attention to the fact that Maresca's house had been searched on other occasions, and thus was inadmissible because it tended to show the bad character of the defendant, which was not in issue. The question was asked, however, and the answer was admissible, not for the purpose of showing the defendant's bad character, but to rehabilitate the witness, whose credibility the defendant challenged by producing the receipt. Furthermore, it requires a great leap of the reasoning for a juror to conclude that the fact that a receipt might have been given the defendant on another date, without more, establishes that there had been another search of the defendant's premises. It is unlikely that the defendant was harmed by the testimony. The court was not in error in refusing to order a mistrial.

## III

Former § 53-298 of the General Statutes proscribed two types of policy offenses. On conviction of the offense described in the first part of the statute, a sentence of up to a year might be imposed on a first offender; on conviction of the offense described in the second part of the statute, a sentence of up to six months might be imposed on a first offender. The first part of the statute described, in detail, activities involved in managing or operating a game of policy.[2] The second part of the stat-

---

[2] "[General Statutes] Sec. 53-298. POLICY PLAYING; GAMING BY USE OF LOTTERY SLIPS OR TICKETS. Except as provided in chapter 226, any person, whether a principal, agent or servant, who owns, possesses, keeps, manages or maintains, or assists in keeping, managing

ute described activities relating to being a bettor or customer in a policy game.[3] Although this part of

or maintaining, any policy-office or place where the game of chance, business, scheme or occupation, commonly known as policy, is, or is reputed to be, played or carried on, or any place where bets or wagers are, or are reputed to be, made upon the result of a drawing in any lottery, or of the drawing of any numbers by chance, or any place which is, or is reputed to be, resorted to for any such purposes in whole or in part, or writes, sells, bargains, exchanges, gives, transfers, delivers, buys, collects or receives, or is concerned in writing, selling, bargaining, exchanging, giving, transferring, delivering or receiving, any policy slips, tickets, tokens, numbers or chances, used in said game of chance, business, scheme or occupation, or in wagering or betting upon the result of any drawing in any lottery, or in any drawing of any numbers by chance, or collects or receives, or is concerned in receiving or collecting, any money or other valuable thing for any such slips, tokens, numbers or chances, or makes, manufactures or keeps, or is the custodian of, any slips, tokens, papers, books, records or registers of bets or wagers, or any appliances or apparatus used for any such purposes, and any owner, mortgagee in possession, lessee or occupant of any building, room, structure or place, or part thereof, who knowingly permits the same to be used or occupied for any of the purposes mentioned in this section, for a first offense, shall be fined not more than one thousand dollars or imprisoned not more than one year, or both; for a second or subsequent offense, shall be fined not less than five hundred dollars nor more than three thousand dollars or imprisoned not more than three years, or both; and each day of any such above-mentioned activity shall constitute a separate offense. . . ."

[3] ". . . Except as provided in chapter 226 any person who plays or takes part in any way in such game of chance, business, scheme, occupation, betting or wagering, in or out of any such office or place, or frequents any place or office where the game of chance, business, scheme or occupation, commonly known as policy, is, or is reputed to be, played or carried on in whole or in part, or any place where wagers or bets are, or are reputed to be, made upon the result of any drawing in any lottery, or of any drawing of any numbers by chance, or frequents any place which is, or is reputed to be, resorted to for any of such purposes in whole or in part, for a first offense, shall be fined not more than one hundred dollars or imprisoned not more than six months or both; for a second offense, shall be fined not more than two hundred fifty dollars or imprisoned not more than one year, or both; and, for a subsequent offense, shall be fined not more than five hundred dollars or imprisoned not more than three years, or both."

the statute includes broad language authorizing punishment of a "person who . . . takes part in any way," this language cannot be construed as including management or operational-type activities such as those with which the defendant was charged.[4]

The second type of offense described in the statute is not included within the first offense, nor does the defendant point to any evidence which suggested that the defendant might have been a bettor rather than an operator. The court properly refused to charge the jury concerning the second type of offense.

The defendant was also charged with being a second offender under § 53-298 because on August 8, 1968, he had pleaded guilty to two counts of policy playing. In charging the jury at the trial on this charge the court did not, despite the state's claim to that effect in its brief,[5] clearly instruct the jury "that it must conclude that the defendant had been previously convicted of policy playing in violation of

---

[4] "BILL OF PARTICULARS The State alleges that the defendant violated Section 53-298 of the General Statutes in that:

(a) he owned, possessed, kept, managed and maintained a policy office or place where the game of chance, business, scheme or occupation, commonly known as policy was and was reputed to have been played or carried on and wherein bets or wagers were made upon the result of a drawing in a lottery or of the drawing of numbers by chance;

(b) he was concerned in writing, selling, bargaining, exchanging, giving, receiving policy slips, numbers or chances, used in said game of chance, business, scheme, or occupation;

(c) he collected and received and was concerned in the collecting and receiving of money for such numbers or chances;

(d) he was the custodian of slips, papers, records or registers of bets or wagers;

(e) he was an owner, lessee, or occupant of a building, structure or place and knowingly permitted same to be used for the purposes set forth in the foregoing paragraphs."

[5] This claim is lacking in factual support in the record.

the first portion of Sec. 53-298." This was error. Had the defendant previously been convicted only as a bettor, he would not have been a second offender under the terms of the statute, which expressly sets forth separate second-offender provisions for the two types of offenses described therein. In the circumstances of this case, however, the error was harmless beyond a reasonable doubt, because there was in evidence a record of the prior conviction which showed that a fine of $1000 had been imposed on each of the two counts. The $1000 fine was permitted only for the type of offense described in the first part of the statute; under the second part, a fine of $500 for a third offense was the maximum permitted. It is thus clear that the prior conviction was for a violation of the first part of the statute and the jury's finding of a prior conviction under the statute was a finding of a conviction of the first part of the statute.

In charging the jury at the trial on the policy playing and destruction of property charges, the court paraphrased portions of the first part of what was then § 53-298 of the General Statutes, proscribing policy playing. It carefully omitted phrases and words in the statute which had no applicability to the evidence introduced in the case, related the activities prohibited to the bill of particulars and to the evidence, and illustrated part of the statute by example. It referred to the explanation of policy playing by one of the witnesses. In discussing the prohibition against knowingly permitting premises to be used for policy playing, the court emphasized the necessity for proving "the mental element involved in the word 'knowingly.'" The charge is clearly distinguishable from that given in *State* v. *Criscuolo,* 159 Conn. 175, 268 A.2d 374. There this

court found (p. 177) reversible error because the court "read the entire statute to the jury [including inapplicable portions] without expanding upon its meaning in any substantial manner," and failed to explain key words such as "policy." The court did not err in failing to define "maintain," "assist," and "custodian," all terms which were used and might be understood in their ordinary meanings. *State* v. *Enanno,* 96 Conn. 420, 427, 114 A. 386. The words "knowingly" and "possess" should have been defined by the court if in relation to the evidence they were used in anything other than their ordinary meaning. The defendant, however, has not shown that to be so, nor in what way, if any, he was harmed by the omission of those definitions.

In connection with the charge that the defendant destroyed evidence, the court charged the jury, "under the law everyone is guilty of a crime who . . . with the intention of committing the offense . . . assists in the actual commission of the offense . . . . [T]he defendant would not be guilty just because he was present in the same house where somebody else, such as his wife, possibly was committing the crime. He would not be responsible for his wife's criminal acts unless he intentionally aided her in doing them, or he requested or ordered her to do them." The court declined to give a charge requested by the defense to the effect that innocent acts which in fact aid another in committing a crime will not support a conviction. The first charge covered the issue adequately; the court is not required to charge in the exact language requested. *Hally* v. *Hospital of St. Raphael,* 162 Conn. 352, 294 A.2d 305. Nor, in the light of the evidence introduced in this case, did the court err in refusing to charge the jury on the statutory definition of the

word "intentionally," which has not been shown to have been used in anything other than its ordinary meaning.

The court charged the jury that "it is not . . . claimed by the state that any officer actually saw Mr. Maresca destroying or tearing any property; in this regard the state is relying upon circumstantial evidence. Therefore, you must examine the facts offered . . . . If you, as triers of the facts, find from all of these facts that you find to have been proven, well, if you conclude that these facts have been proven, or enough of them to warrant drawing an inference of the guilt of the defendant, then you may do so, if the drawing of such inference is logical." Counsel for the defense requested a charge on circumstantial evidence which was taken from a decision of a court of another state; it was not error for the court to decline to use this charge.

The charge adequately covered the presumption of innocence and the necessity of proof beyond a reasonable doubt. It was not error to refuse to give requested charges that the jury "must decide the issues of fact in this case solely upon the evidence . . . without bias or prejudice," or that "the defendant may rely upon evidence brought out in cross-examination." These statements are not shown to be related to any special factual situation in the case, and the defendant's brief does not suggest any way in which the absence of these charges harmed the defendant.

There is no error.

In this opinion the other judges concurred.