STATE OF CONNECTICUT *v.* JOSEPH M. SPATES

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued October 3—decision released November 7, 1978

*Joseph M. Spates,* pro se, the appellant (defendant), and, as his legal advisor, *Donald D. Dakers,* assistant public defender.

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *John J. Kelly,* assistant state's attorney, for the appellee (state).

LONGO, J. The defendant was charged in a four-count information with first degree manslaughter, in violation of General Statutes § 53a-55 (a) (3), with second degree robbery, in violation of General Statutes § 53a-135 (a) (2), and with two counts of first degree unlawful restraint, in violation of General Statutes § 53a-95 (a). The defendant was convicted by a jury and, from the judgment rendered on the verdict, he has appealed claiming that the

trial court erred in certain of its instructions to the jury, in its denial of his request for instructions, in its charge concerning the elements of manslaughter under § 53a-55 (a) (3), in its denial of his motion to dismiss, and in its denial of his motion to set aside the verdict.

From a review of the evidence, the jury could have found the following: In the early afternoon hours of May 3, 1974, Mr. and Mrs. Elwyn Murdock of Hamden, Connecticut, received a telephone call from the defendant, identifying himself as Dr. J. Merriwether, who inquired as to whether the Murdocks had antique jewelry and silverware for sale. The Murdocks used a portion of their residence for the sale of antiques by appointment, and arrangements were made for a visit that afternoon by the defendant. At approximately 4 p.m., the defendant arrived and, after viewing the Murdocks' antiques, made arrangements to return later that evening with funds to purchase the items of antique silver that he had selected. During the conversation of that afternoon, Mrs. Murdock, thinking that the defendant was a medical doctor, informed him that her husband had retired to their home to conduct the antique business because of his health, that he had previously had four heart attacks, and that she was now working together with Mr. Murdock. The defendant replied that Mr. Murdock had been lucky so far. At about 9 p.m., the defendant returned and, after casual discussion over a cup of coffee with the Murdocks, drew Mr. Murdock aside and handed him a note informing him that he (the defendant) intended to rob Mr. Murdock. The defendant then forced the Murdocks down to the basement of their home, displaying what appeared to the Murdocks to be a handgun.

Upon reaching the basement, the defendant produced from a briefcase two sets of handcuffs and some rope. He handcuffed Mrs. Murdock's hands and tied her legs, forcing her to lie on her stomach on the basement floor. Mr. Murdock was similarly bound, but the defendant allowed him to lay face up on the floor. At this point, Mr. Murdock began to breathe very heavily and said to the defendant, "Please call a doctor. I'm having a heart attack." After this plea had been repeated several times, the defendant propped up Mr. Murdock's head with a vase; a doctor was never called, however. The defendant then left Mr. and Mrs. Murdock in the basement and proceeded through the house, taking several items of value, and approximately $300 in cash.

After the defendant left the house, Mr. Murdock again stated that he could not breathe and Mrs. Murdock, upon freeing herself, was able to summon an ambulance, which arrived within ten minutes. Mr. Murdock was given mouth-to-mouth cardiopulmonary resuscitation at the Murdocks' residence, but appeared unresponsive. He was pronounced dead at the Yale-New Haven Hospital shortly after arrival. Medical testimony at trial established that the cause of Mr. Murdock's death was a heart attack, brought on by the emotional stress resulting from the action of the defendant. Medical evidence further established that Mr. Murdock had suffered at least two previous heart attacks and was, on May 3, 1974, under a doctor's care for his heart condition. An autopsy performed subsequent to Mr. Murdock's death confirmed the testimony that he had had several prior heart attacks, leaving his heart in a weakened condition.

At the outset, we note that the defendant testified at trial and conceded virtually all of the state's case, with two exceptions, hereinafter to be discussed. Thus, the issues that merit our attention have, by virtue of the defendant's testimony, been considerably narrowed. The defendant's primary claim of error involves two related concepts. He claims that actual, direct physical injury is an element of the crime of manslaughter, as defined by General Statutes § 53a-55 (a) (3),[1] and, in relation to this, that the infliction of external physical injury upon a victim must be found before a causal relation between the defendant's conduct and the victim's death may be found to exist. Thus, the defendant argues, the trial court erred in its instruction to the jury concerning "proximate causation" in relationship to the defendant's "conduct" under § 53a-55 (a) (3). The defendant appears to argue that since the cause of Murdock's death was not a physical blow inflicted by the defendant, but rather a heart attack caused by the stress of the situation into which the defendant had placed Murdock, he could not, as a matter of law, be found to have "caused" Murdock's death. We disagree.

It may have been the law at one time that there could be no culpable homicide that was not the result of some kind of corporal harm inflicted upon the victim. See, e.g., *Regina* v. *Murton*, 3 Fost. & Fin. 492, 176 Eng. Rep. 221 (1862). Today, however, almost all courts have rejected this view of criminal

---

[1] "[General Statutes] Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby *causes* the death of another person." (Emphasis added.)

liability. See annot., 47 A.L.R.2d 1072. In the present case, we have only to look to the words of the manslaughter statute. Section 53a-55 (a) (3) merely proscribes *"conduct* which creates a grave risk of death to another person."  (Emphasis added.) We find no case where this court has construed that word to require the actual infliction of a physical blow.[2]  We hold that the acts of the defendant constituted "conduct"[3] within the intendment of General Statutes § 53a-55 (a) (3), and that the trial court did not err in charging the jury that they could convict the defendant of manslaughter if they found that the defendant inflicted "emotional injury, stress or trauma" which proximately caused Murdock's death, notwithstanding that the death-inducing act of the defendant was not a physical blow.  In this connection, we are further of the opinion that the consequences of the defendant's act of binding Murdock and placing him in extreme fright and

[2] The defendant argues that cases such as *State* v. *Tomassi,* 137 Conn. 113, 75 A.2d 67, *State* v. *Leopold,* 110 Conn. 55, 147 A. 118, and *State* v. *Block,* 87 Conn. 573, 89 A. 167, hold that the infliction of physical injury as the proximate cause of death must be found to sustain a manslaughter conviction under the statute. The defendant misreads those cases.  In *Tomassi* (gunshot wound to spinal column caused blood clot resulting in death), *Leopold* (defendant set fire causing burns that resulted in victim's death), and *Block* (head injury caused by defendant's reckless driving caused delirium tremens resulting in death), it was *sufficient* for criminal liability, although not *necessary,* that a physical act, followed by an intervening event, caused death.  These cases did not hold, however, that a direct physical injury is necessary before the actor can be said to have been the "proximate cause" of another's death.

[3] One of the defendant's claims of error, that the trial court erred in instructing the jury that the defendant's "inaction" could constitute "conduct" within § 53a-55 (a) (3), can be dismissed with little discussion.  We approved the principle long ago that a cause of death sufficient to establish criminal liability could be an act, or *omission* to act.  *State* v. *Tomassi,* 137 Conn. 113, 119, 75 A.2d 67; see Perkins, Criminal Law (2d Ed.), Causation, § 9, pp. 732 et seq.

shock, which act was the proximate cause of Murdock's heart attack, are not excused, nor is the defendant's criminal liability lessened, by the preexisting heart condition of Murdock which rendered him unable to withstand the situation which the defendant had thrust upon him. See 40 Am. Jur. 2d, Homicide, §§ 18, 20, p. 313; annot., 47 A.L.R.2d 1072, 1077; LaFave & Scott, Criminal Law, Causation, § 35, p. 257. The defendant took Murdock as he found him: "Every person is held to be responsible for the natural consequences of his acts, and if he commits a felonious act and death follows, it does not alter its nature or diminish its criminality to prove that other causes cooperated to produce that result." *State* v. *Leopold,* 110 Conn. 55, 61, 147 A. 118; *State* v. *Alterio,* 154 Conn. 23, 30, 220 A.2d 451; see Perkins, Criminal Law (2d Ed.), Causation, §9, p. 727; *People* v. *Stamp,* 2 Cal. App. 3d 203, 82 Cal. Rptr. 598, cert. denied, 400 U.S. 819, 91 S. Ct. 36, 27 L. Ed. 2d 46; *Commonwealth* v. *Tatro,* 346 N.E.2d 724 (Mass. App.). If Murdock's death came about as a result of the conjunction of his heart disease and the violence, shock or excitement caused by the defendant's acts, it was still brought about by the criminal "conduct" of the defendant, for the consequences of which he is answerable. *People* v. *Stamp,* supra; see *State* v. *Luther,* 285 N.C. 570, 206 S.E.2d 238.

The defendant's claim that the trial court erred in instructing the jury on the meaning of "proximate cause" under General Statutes § 53a-55 (a) (3) is without merit. "Proximate cause" in the criminal law does not necessarily mean the last act of cause, or the act in point of time nearest to death. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal

offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the resulting death. It is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence. See *State* v. *Tomassi*, 137 Conn. 113, 75 A.2d 67; *State* v. *Leopold*, supra; 40 C.J.S., Homicide, § 11 (b), p. 854; see, generally, Cardozo, The Paradoxes of Legal Science, pp. 81 et seq.; Beale, "The Proximate Consequences of an Act," 33 Harv. L. Rev. 633. It is unnecessary for "proximate cause" purposes that the particular kind of harm that results from the defendant's act be intended by him. In many situations giving rise to criminal liability, the harm that results is unintended, yet is directly or indirectly caused by an act of the defendant.[4] In such cases, where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of

[4] For example, in *People* v. *Stamp*, 2 Cal. App. 3d 203, 82 Cal. Rptr. 598, cert. denied, 400 U.S. 819, 91 S. Ct. 36, 27 L. Ed. 2d 46, the defendants, during the course of a robbery, forced one of the victims, a sixty-year-old man with a history of heart disease, to lie down on the floor. Fifteen minutes after the robbery, the victim suffered a heart attack and died. The jury found that the fright and shock induced in the deceased triggered the heart attack, resulting in death. Although the defendants did not intend that result, the jury found that the conduct of the defendants proximately caused the heart attack and death. See also *State* v. *Luther*, 285 N.C. 570, 206 S.E.2d 238, in which the defendant assaulted the victim with a pipe, which blow was not alone sufficient to cause death. The jury found, however, that the victim's preexisting heart condition had weakened him, that the increased cardiac demand occasioned by the assault caused death, and that the defendant's conduct was not excused because death only "indirectly" followed from the assault.

legal causation unbroken and holds the defendant criminally responsible. See *People* v. *Kibbe,* 35 N.Y.2d 407, 321 N.E.2d 773, rev'd on other grounds, 534 F.2d 493 (2d Cir.), rev'd in part, 431 U.S. 145, 97 S. Ct. 1730, 52 L. Ed. 2d 203. A review of the trial court's charge discloses that it instructed the jury substantially in accord with those principles.[5] The test to be applied to any part of a charge is whether the charge considered as a whole presents the case to the jury so that no injustice will result. *State* v. *Mullings,* 166 Conn. 268, 274, 348 A.2d 645. When considered in this context, the instruction complained of was not erroneous. *State* v. *Annunziato,* 169 Conn. 517, 535, 363 A.2d 1011.

---

[5] The court instructed the jury as to the concept of proximate cause as follows:

"In legal terms, proximate cause of death is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the death, and without which the death would not have occurred. It is the efficient cause of death, the one that necessarily sets in operation the factors that accomplish the death. Note particularly in this context that even though there may have been some causative influence from intervening factors or events, such as in this case Mr. Murdock's preexisting heart condition, it is yet sufficient to proximate cause and to the legal responsibility of the defendant thereupon that the defendant's conduct set in motion the chain of events which ultimately produced Mr. Murdock's death as their sufficiently direct result or consequence. If the defendant's conduct in his relations with Mr. Murdock inflicted upon the latter physical or emotional injury or stress or trauma which was in this sense the proximate cause of his death, then the defendant's conduct, under the circumstances, caused his death and satisfied this element of the law or charge upon this offense, even though such physical or emotional stress or trauma were not the only cause of Mr. Murdock's death, and although Mr. Murdock had already been enfeebled by poor physical condition or severe heart disease, and even though it is probable that a person in sound physical condition would not have succumbed from the effects of the defendant's conduct upon him, and even though it is probable that the defendant's conduct only hastened Mr. Murdock's death, or that he would have died soon thereafter from another cause or causes."

The defendant next claims error in the trial court's denial of his request to charge the jury as to the meaning of "extreme indifference to human life" under General Statutes § 53a-55 (a) (3) and in the court's failure to define that term for the jury. No definition of "extreme indifference to human life" is found in title 53a (Penal Code) of the General Statutes. The court, however, charged the jury extensively on the meaning of "recklessly." In this connection, the court instructed the jury as to the meaning of "extreme indifference to human life": "Mere carelessness is not enough, nor is ordinary recklessness sufficient. The law here requires extreme indifference to human life." Although the code does not define the term, the significance of the omission of an instruction on "extreme indifference to human life" under the code may be evaluated by a comparison with the instructions that were given. See *Henderson* v. *Kibbe,* 431 U.S. 145, 156, 97 S. Ct. 1730, 52 L. Ed. 2d 203. The court's extensive charge on the meaning of "recklessly," coupled with the evidence before the jury, adequately indicated the nature of acts that would qualify as "extremely indifferent to human life." By returning a guilty verdict on the manslaughter charge, the jury could reasonably conclude, in accordance with the court's instruction on recklessness, that the defendant exhibited an "extreme indifference to human life." There was evidence before the jury that the defendant was well aware of Murdock's heart condition, and that Murdock was having a heart attack at the time of the robbery. Yet the defendant failed to desist from his course of conduct by unbinding Murdock or by taking any steps to remove Murdock from the position of peril in which the defendant had placed him. Thus, the

jury could easily have determined that the defendant acted "recklessly" and with an "extreme indifference to human life." Moreover, the defendant's requested instruction on that term did not materially differ from the instruction the court gave. The court is not required to charge in the exact language requested. *State* v. *Maresca,* 173 Conn. 450, 460, 377 A.2d 1330. Nor, in light of the evidence, did the court err in refusing the defendant's instruction on the term "extreme indifference to human life," when the defendant has not shown that the phrase was used in anything other than its ordinary meaning. Id., 461.

The defendant next claims that the trial court's charge, in toto, as to the elements of the crime of manslaughter in the first degree was inaccurate and confusing and that it thereby prejudicially misled the jury. We have already determined that the portion of the court's charge with respect to proximate cause was clear and accurate. A review of the remainder of the charge indicates that it did not mislead the jury, nor was the charge confusing. Although there were certain deficiencies in the charge, any confusion that was thereby engendered was adequately cleared up by subsequent, supplemental instructions by the court. The trial court did not abuse its discretion in making reasonable comments on the evidence; *State* v. *Vincenzo,* 171 Conn. 240, 244, 368 A.2d 219; and it is not "reasonably probable that the jury [could have been] misled" by the entire charge. *State* v. *Rose,* 169 Conn. 683, 687–88, 363 A.2d 1077; *State* v. *Ralls,* 167 Conn. 408, 422, 356 A.2d 147; see *Cupp* v. *Naughten,* 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368.

Finally, the defendant makes a somewhat broadside "due process" attack on the trial court's denial

of his motion to dismiss certain counts of the information and the denial of his motion to set aside the verdict. Both motions had as their premise the assertion that the state did not produce evidence sufficient to sustain the jury verdict of guilty as to all counts of the information.[6] As we have previously stated, the defendant testified at trial and admitted almost all of the state's case, with two exceptions. The defendant (1) denied that he was informed on the afternoon of the robbery that Murdock had a heart condition and (2) denied that Murdock told him that he (Murdock) was having a heart attack during the course of the robbery. Both of those facts bear on the defendant's "indifference to human life" and his reckless engagement in "conduct which creates a grave risk of death to another person," which elements the state is required to prove beyond a reasonable doubt under the manslaughter statute. By its verdict, the jury could reasonably have believed the state's witness, Mrs. Murdock, and disbelieved the defendant's version of the events surrounding the robbery. The credibility of witnesses is to be determined by the jury as trier of fact; *State* v. *Malley,* 167 Conn. 379, 381, 355 A.2d 292; *State* v. *White,* 155 Conn. 122, 123, 230 A.2d 18; and the evidence must be given a construction most favorable to sustaining the jury's verdict. *State* v. *Benton,* 161 Conn. 404, 409, 288 A.2d 411. As we recently stated: " 'This court's task in reviewing the sufficiency of the evidence to sustain the verdict of a jury is to construe the evidence as favorably as possible with a view toward sustaining the verdict and then to decide whether

---

[6] The defendant in his brief does not seriously pursue a claim that there was insufficient evidence to sustain the robbery and unlawful restraint counts. We thus limit our discussion to the evidence supporting the manslaughter count.

the verdict is one which jurors acting reasonably could have reached.'" *State* v. *Jones,* 173 Conn. 91, 94, 376 A.2d 1077; *State* v. *Jeustiniano,* 172 Conn. 275, 281, 374 A.2d 209. Within this context, clearly the evidence presented by the state at trial was sufficient to sustain the jury in their verdict on all counts of the information. There was no error in denying the defendant's motions.

There is no error.

In this opinion the other judges concurred.