In re Angelo AMARANTO, Debtor.

Daniel Garcia, Plaintiff,

v.

Angelo Amaranto, Defendant.

Bankruptcy No. 98–51991.
Adversary No. 98–5120.

United States Bankruptcy Court,
D. Connecticut,
Bridgeport Division.

Sept. 13, 2000.

Christian Young, Bridgeport, CT, for Plaintiff.

Lee A. Samowitz, Bridgeport, CT, for the defendant.

## DECISION AND ORDER ON DISCHARGEABILITY OF DEBT

ALAN H. W. SHIFF, Chief Judge.

The plaintiff-creditor seeks a determination that he was injured by the defendant-debtor's civil rights (police brutality) action against him in the Connecticut Superior Court and that the resulting debt should not be discharged because the injury was "willful and malicious." *See* 11 U.S.C.

§ 523(a)(6).[1] For the reasons that follow, judgment shall enter in favor of the plaintiff.

## BACKGROUND

The following facts are found from the evidence adduced at trial and an assessment of the credibility of the witnesses. The plaintiff is a Bridgeport, Connecticut police officer. He and other members of the Bridgeport police department were on notice that human body parts were being deposited in public receptacles. On August 5, 1995, the plaintiff, while off-duty, out of uniform, and driving his personal automobile, observed the defendant abruptly stop in front of him in a pickup truck heading eastbound on Boston Avenue near The Green in Bridgeport. *Tr. 2* at 9–10.[2] The plaintiff identified himself as a police officer and told the defendant that he could not stop his car there. *Id.* The defendant ignored him and began dumping the contents of numerous buckets into a receptacle on The Green. *Id.* at 11–12. The plaintiff asked the defendant what he was doing. The defendant continued to ignore him, hurriedly completed the dumping, and drove away. *Id.* at 12. The plaintiff followed, sounding his horn. *Id.* at 13. He passed the defendant's vehicle, showed his badge, and instructed him to pull over. The defendant accelerated past the plaintiff, and the plaintiff continued the pursuit. *Id.* at 14. The defendant stopped on Wake Street. The plaintiff got out of his vehicle and, while holding his badge, approached the defendant's truck. The defendant then abruptly drove about 15 feet in reverse, stopped, and ducked inside

the truck. *Id.* at 15–16. Fearing that the defendant might be reaching for a weapon, the plaintiff put his hand on his holstered weapon. The defendant sat up, saw the plaintiff, and abruptly drove his vehicle back toward where the plaintiff was standing. *Id.* The plaintiff then drew his weapon but returned it to its holster during a patdown search after the defendant, as directed, exited his vehicle. The plaintiff did not arrest the defendant, *id.* at 18–20, but instead called for back up assistance. The Bridgeport police department dispatched officer Michelle Hernandez, who ascertained that the defendant had been dumping leaves. *Tr. 3* at 14. The defendant did not tell officer Hernandez that he had been attacked by the plaintiff or that he had urinated in his pants out of fear, as he later claimed. *Tr. 3* at 5, 8. Officer Hernandez did not observe any physical injury or urine stain. *Tr. 3* at 6, 7–8. After Officer Hernandez determined that the defendant did not have insurance, and a check of the license plates on the defendant's truck revealed that it was not registered, she arranged for it to be towed from the scene. *Tr. 3* at 9, 13.

On August 9, 1995, the defendant filed a citizens' complaint with the Bridgeport Police Department in which he claimed that the plaintiff had physically abused, harassed, and frightened him, causing him to "involuntarily urinat[e] in [his] pants twice." *See Plaintiff's Complaint* at ¶ 4 and *Plaintiff's Exh. 8*. The defendant repeated those allegations to the Office of Internal Affairs, which commenced an investigation.[3] *Tr. 3* at 47–48. *See Plaintiff's Complaint* at ¶ 7.

1. On January 26, 2000, this court ruled that the debt was not discharged, and ordered the parties to propose a pretrial order on what, if any, damages resulted from the defendant's willful and malicious conduct. At a May 24, 2000 hearing the court determined, *sua sponte*, that it did not have jurisdiction over the issue of damages resulting from a personal injury claim, *see* 28 U.S.C. § 157(b)(5) and *infra* n. 9. The court also rejected the defendant's "motion to reargue" for the reason that

there had been no oral argument and the arguments of counsel were not necessary.

2. Transcripts 1–5 are numbered in the docket as 25, 23, 26, 27, and 28 respectively.

3. The investigations by the Chief of Police and Internal Affairs resulted in the identical conclusions that the defendant's allegation of excessive force was false. *See Plaintiff's Exh. 4* and *5*. The allegations regarding "discretion

On October 3, 1995, the defendant commenced a police brutality claim against the plaintiff in Connecticut Superior Court, alleging that the plaintiff had violated his civil rights by assaulting him on August 5. *Tr. 2* at 31–32; *Plaintiff's Exh. 1.* The matter was reached for trial on January 8, 1998. Several days before that date, two prospective witnesses for the defendant informed a Bridgeport Police Department detective that the defendant had offered to buy their testimony. As a result of that information, arrangements were made for the use of a recording device to be worn by those informants. *Testimony of Detective Leonard Sattani, tr. 3* at 19–20. On the basis of the recorded conversation, the defendant was arrested in court as the trial was about to commence. *Plaintiff's Exh. 3; tr. 2* at 33–35, 41; *tr. 3* at 21–42. On January 9, the defendant withdrew his civil rights action. *Plaintiff's Exh. 2; tr. 2* at 33. Subsequently, the defendant pleaded guilty to witness tampering, CGS § 53a–151. He was thereafter convicted, sentenced, and incarcerated for six months. *See tr. 3* at 31. It is worthy of note that the defendant did not object to the admissibility of this evidence or offer any mitigating explanation.

On March 20, 1998, the plaintiff commenced an action against the defendant in Connecticut Superior Court, alleging that the defendant's civil rights action constituted vexatious litigation. Two weeks later, the defendant filed this chapter 7 case which stayed the plaintiff's state court action. *See* 11 U.S.C. § 362(a). On December 8, 1998, the plaintiff commenced the instant adversary proceeding which alleges that he was willfully and maliciously injured by the defendant's civil rights complaint which the defendant knew was based upon fictitious allegations of police brutality. As a result of that action and subsequent conduct, he suffered an exacerbation of a preexisting Crohn's disease, humiliation, disgrace, pain, suffering, and mental anxiety. As a consequence, the plaintiff seeks a determination that the debt resulting from that injury should not be discharged. *See* § 523(a)(6) and *Complaint* at ¶¶ 3, 6, 11, and p. 4.

## DISCUSSION

■ Code section 523(a)(6) excepts from discharge a "debt ... for willful and malicious injury by the debtor to another entity ...." The dischargeability analysis first requires a determination whether there was an injury. If so, it must be determined whether that injury was "willful and malicious."

### *Was there an injury?*

■ The plaintiff's treating physician, Dr. Douglas Duchin, testified that he began treating the plaintiff in November 1992 for various ailments, including abdominal pain, diarrhea, anxiety, fatigue, and stress which were the basis of his diagnosis that the plaintiff had Crohn's disease. Following treatment, the plaintiff's symptoms abated by the end of 1993. The plaintiff testified credibly that he was upset by the false accusations of the civil rights action, *tr. 2* at 25, 32, 36–43, and that the defendant had frightened him by insinuating that he would have the plaintiff's house repainted a new color once the defendant won his lawsuit. *Tr. 5* at 8–9, 12–13. As a consequence, the Crohn's symptoms reappeared, and in June, 1997,

and judgment during [an] off-duty encounter" were referred to the Board of Police Commissioners. *Plaintiff's Exh. 4* and *5. See also defendant's Exhibit A* and *testimony of Lieutenant Lin Desarli, tr. 3* at 48–51. That board ultimately exonerated the plaintiff. *Plaintiff's Exh. 6; tr. 2* at 30–31; *tr. 3* at 53. Although those conclusions were received in evidence without objection, they are not relied upon for the court's determination that the defendant's

commencement of the civil rights action inflicted a willful and malicious injury on the plaintiff. The defendant's citizens' complaint, *Plaintiff's Exh. 8,* is relied upon as one of the bases for that determination, *see op. infra* at 599–600, because it itemized specific conduct which the defendant clearly intended to include within the allegations of his civil rights action. *See Plaintiff's Exh. 1,* Count 1 at ¶¶ 4–5, Count 2 at ¶¶ 4–5.

he returned to Dr. Duchin who testified that Crohn's disease symptoms could be exacerbated by the episodes of stress described by the plaintiff.

Under cross-examination, the plaintiff testified that police work is generally stressful and that he had filed no claim for workers' compensation for work-related injuries. During redirect testimony, he persuasively articulated a distinction between general on-the-job stress that police officers must deal with on a daily basis and the stress an officer endures when falsely accused of professional misconduct. On the basis of the foregoing, it is concluded that the plaintiff was injured by the commencement of the civil rights action and the subsequent conduct of the defendant.

### Was the injury "willful and malicious"?

Having found that there was an injury, the question is whether it was willfully and maliciously caused without regard to the issue of any appropriate damages. It is worthy of note that under Connecticut law, the commencement of a vexatious lawsuit would constitute a willful and malicious injury,[4] but such a determination in the context of a dischargeability action turns on the meaning of willful and malicious as federal courts have applied those words under the bankruptcy code.

 A determination of non-dischargeability under subsection (a)(6) requires proof that there was a willful and malicious injury, that is, "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury...". *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 975–76, 140 L.Ed.2d 90 (1998).

Willful means "deliberate or intentional," and malicious means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Financial Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2nd Cir.1996). Malice may be implied "by the acts and conduct of the debtor in the context of [the] surrounding circumstances." *Id.* A victim's pre-existing condition is not a factor in the determination of whether an antagonist's conduct was malicious and willful. *See, e.g., State v. Spates*, 176 Conn. 227, 231, 405 A.2d 656 (1978). *See also*, ABA Journal, 'EGGSHELL SKULL' DOCTRINE APPLIES TO VICTIMS' EMOTIONAL PSYCHES (April, 1998); *Vosburg v. Putney*, 80 Wis. 523, 50 N.W. 403 (1891).

 The defendant's two count complaint alleges that the plaintiff intentionally violated his civil rights by an assault and battery that included a pistol-whipping. *See* October 31, 1995 Complaint, *Plaintiff's Exh. 1* at 1, ¶ 4 and 2, ¶ 4. The defendant's citizens' complaint, *see supra* n. 3, similarly contains a narrative of the August 5 confrontation which includes claims that the plaintiff grabbed him "by the scruff of the neck," "picked [him] up off the ground with [his] hands up," "slammed [him] up against the truck," "smashed [his] head against the window, and "[held] a cocked gun [against his] skull." *Plaintiff's Exh. 8.*

The defendant attempted to support those claims of police brutality by offering the testimony of his sister and others,

---

4. Connecticut recognizes the torts of vexatious lawsuit and abuse of process. *Vandersluis v. Weil*, 176 Conn. 353, 356, 407 A.2d 982 (1978), *quoted in DeLaurentis v. New Haven*, 220 Conn. 225, 248–250, 597 A.2d 807 (1991) (adopting the Restatement (Second) of Torts § 680) (Vexatious lawsuit arises where there is malice, a lack of probable cause, and termination of the prior civil suit in the plaintiff's favor "so long as it terminated without consideration."). *See also*, Conn. Gen. Stats. § 52–568(a) (providing double and treble damages to a plaintiff who successfully prosecutes a vexatious lawsuit case) and *Northwestern Mutual Life Ins. Co. v. Estate of Greathouse*, 2000 WL 486963, *5 n. 4 (Superior.Ct.Conn.2000) ("An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed ...").

which was unpersuasive.[5] For example, the claim that the defendant urinated in his pants, *see tr. 3* at 63, is contradicted by the testimony of Officer Hernandez, the Bridgeport police officer who was called to the scene by the plaintiff, and George Velasquez, the driver of the tow truck called by the police to tow the defendant's truck who testified that he would not have allowed the defendant in his tow truck if he had urinated in his pants.[6]

The plaintiff and the defendant were present in court for the duration of the trial. The plaintiff is comparatively sleight in stature, height, and weight. The assertion that he "picked [the defendant] off the ground," *see op. supra* at 599, who is a heavy set person, is unbelievable. It is also noted that there is no corroborative documentary evidence to support the defendant's allegations, e.g., photographs or medical records.[7]

By contrast, all of the credible evidence supports the plaintiff's version of the events of August 5 and his denial that he physically assaulted the defendant or verbally threatened him. *Tr. 2* at 32. That testimony was corroborated by witness Ignacio Calzadilla, who was standing in his driveway adjacent to where the confrontation occurred. He testified that although he saw the plaintiff take out his badge and identify himself as a police officer, he did not see the plaintiff strike, pistol-whip, kick, or beat the defendant or press him against the vehicle. *Tr. 4* at 30. The plaintiff's testimony was further corroborated by Officer Hernandez, who testified that the defendant did not appear to have been assaulted. *Tr. 3* at 6. But perhaps the most compelling corroboration of the plaintiff's version of events is the undisputed fact that the defendant attempted to manufacture evidence to support his claims of police brutality by bribing two people.[8] As noted, he thereafter pleaded guilty to witness tampering.

5. *See Bose Corporation v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it."); *United States v. Garcia–Duarte,* 718 F.2d 42, 48 (2nd Cir.1983) (Where the credibility of a witness is challenged, the finder of fact is "entitled to reject his testimony, in whole or in part . . . .").

6. The testimony of Gary Mastronardi, the defendant's civil rights attorney, did not address the merits of the defendant's civil rights action. He filed that action on the basis of what the defendant told him. *See Tr. 3* at 11. As noted, *op.* at 598, the defendant did not object to the evidence of his arrest and conviction of attempting to bribe witnesses. *See Tr. 3* at 23, 29, and 31. Nonetheless he attempted to challenge the accuracy of the transcript of the recorded conversation which was the basis of the conviction. Rather than offer the recording itself, he proffered the testimony of attorney Mastronardi, who apparently listened to a copy of the recording and reached the conclusion that the transcript was not accurate with respect to one word, i.e., "scam", that appeared on page 9. *See Tr. 4* at 16–17 and 23–26. Although such a claim would have been better made by producing the original tape recording, even if the attorney's interpretation were accurate, the transcript still provides overwhelmingly persuasive evidence of the defendant's guilt, *see id.* at 2, 7, 9, and 11. Of course, the best evidence that the defendant attempted to bribe witnesses to support his police brutality allegations is the testimony that he pleaded guilty to that crime. More to the point, that evidence supports the conclusion that the defendant knew that his civil rights action was founded in fiction.

It should be noted that in a chambers conference, the court specifically instructed the civil rights attorney not to state his interpretation of the allegedly mistranscribed word. Notwithstanding that admonition, he stated that the correct transcription was the word "stand." *See Plaintiff's Exh. 3* at 9. That conduct bordered on contempt.

7. His attempt to offer the testimony of a physician that might have established his inability to testify due to a medical condition was denied for the reasons provided in the appendix to this opinion.

8. It is apparent from the transcript of the tape recording that formed the basis of the defendant's prosecution that he offered each of the witnesses ten percent of any judgment or settlement, *Plaintiff's Exh. 3* at 9, which he believed was worth up to $200,000, after attorney's fees, *id.* at 2–3.

Connecticut General Statutes, § 53a–151, provides that

> [a] person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding.

Fed.R.Evid. 609(a)(2), made applicable to bankruptcy proceedings by Fed. R. Evid. 1101(a), provides that "[f]or the purpose of attacking the credibility of a witness, . . . evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment." But because the defendant was not a witness, the evidence of his guilty plea may not be used for assessing his credibility. Irrespective of the defendant's credibility, and mindful that there might be other reasons why the defendant withdrew his case and pleaded guilty, the fact that he bribed witnesses to manufacture evidence supports the conclusion that the defendant knew that the allegations of his civil rights action were false when he commenced that action and that he filed that action with the deliberate intent to injure the plaintiff financially and emotionally. It clearly had that effect, *see op. supra* at 598–99.

Accordingly, the debt, irrespective of its amount, is excepted from discharge, and IT IS SO ORDERED.[9]

## APPENDIX

### Trial Management

At the end of the trial day on August 26, 1999, in response to the court's inquiry, the defendant's attorney stated that he intended to call five witnesses. *Tr. 3* at 73–74.

9. This court's conclusion that the defendant willfully and maliciously commenced and prosecuted a false claim is intended to have preclusive effect. As noted, the damages phase must be addressed by another forum as this court lacks the jurisdiction to preside

The court "suggest[ed] that [attorney Samowitz] look at the pretrial order" and noted that "the purpose of the pretrial order is so that each side knows what witnesses the other side is going to call." *Id.* at 74. On September 1, 1999, attorney Samowitz stated that he intended to produce the defendant's testimony the next day. On that date, instead of producing the defendant as a witness, attorney Samowitz sought a continuance, so that he could call a new witness, Dr. Wainik, *see Tr. 5* at 16, a physician who ostensibly would attest to the defendant's inability to take the stand because of an alleged psychiatric problem. *Tr. 5* at 2 and 17. However, it is also clear from the transcript that day that attorney Samowitz intended to use Dr. Wainik primarily for purpose of offering a last-minute affirmative defense, i.e., that the defendant was medically incapable of forming the requisite willful and malicious intent when he commenced the civil rights action:

> MR. SAMOWITZ: I think one of the issues that bears on this case is "was [the defendant's conduct] malicious?", you know, and what I'm seeming to be discovering here is maybe the underlying symptoms of the psychiatric problem—
>
> THE COURT: I don't know anything about any psychiatric problem.
>
> MR. SAMOWITZ: Well, this is what this letter [1] says, your honor.
>
> * * *
>
> THE COURT: You want this doctor to testify about an explanation for your client's conduct, is that it?
>
> MR. SAMOWITZ: Part of it, and for . . . reasons that . . . the defendant

over personal injury tort cases. *See* 28 U.S.C. § 157(b)(5).

1. Dr. Wainik apparently had provided an August, 1999 letter to that effect. The letter was not offered into evidence.

himself cannot identify today because of his medical condition . . . .

*See Tr. 5 at 17–18.*

The defendant's motion for a continuance was denied because he did not list Dr. Wainik on the witness list and because he had not pleaded diminished capacity as an affirmative defense.[2] Federal Rule of Civil Procedure 8(c), made applicable to this proceeding by Rule 7008, F.R.Bankr.P. provides "In pleading to a preceding pleading, a party shall set forth affirmatively . . . any other matter constituting an avoidance or affirmative defense. . . ."

The policy that informs the rule is to permit the plaintiff an appropriate vehicle for discovery and investigation into the validity of the affirmative defense asserted, and to give the court the ability, to the maximum extent possible, to manage its trial calendar. The failure to plead an affirmative defense results in its waiver. *See In re Galanis,* 71 B.R. 953, 959 (Bankr.D.Conn.1987) and authorities cited therein. *See also Pinto Trucking Service, Inc. v. Motor Dispatch, Inc.,* 649 F.2d 530 (7th Cir.1981) (a trial court may appropriately deny a defendant's last minute attempt to raise affirmative defenses where there has been no compliance with Rule 8). *See also, e.g., Robert R. Crane,* TRIAL OF ISSUE OF INCOMPETENCY IN CIVIL ACTIONS, 55 OH Jur.3d § 183 (1998) ("[a] party claiming disability must set up the lack of mental capacity as an affirmative defense and must assume the burden of proof on that issue.").

Similarly, a trial court does not ordinarily abuse its discretion in denying a party's request to raise a new issue on the eve of trial when that issue could have been raised earlier. *Moretti v. Commissioner of Internal Revenue,* 77 F.3d 637, 644 (2nd. Cir.1996) (citing *Martell v. Boardwalk Enterprises, Inc.,* 748 F.2d 740, 749–50 (2d Cir.1984)) (denial of motion to assert a claim of indemnification on the eve of trial is not an abuse of discretion, as the claim could have been raised earlier by moving to amend the answer).

The allegation of diminished capacity further lacked candor, because as the evidence disclosed, the defendant had the presence of mind to see an attorney immediately after the August 5 incident; thereafter produced a hand-written citizens' complaint; prosecuted that complaint, *Tr. 3* at 5; attempted to bribe potential witnesses; and pleaded guilty without asserting the affirmative defense of a mental disease or defect. *See* Connecticut General Statutes § 53a–13. He also listed himself as a witness in this case on his July 8, 1999 witness list, just 7 weeks before trial, and on September 1 his attorney stated that he would call the defendant as a witness the following day.

---

2. It is the responsibility of a defendant's attorney to learn and understand the various affirmative defense options available to his client. If attorney Samowitz believed that the defendant lacked the requisite intent, he should have affirmatively pleaded those facts. If he was uncertain as to the defendant's mental capacity, he should have sought to discover that information. His failure to do so might constitute malpractice and/or a violation of the Connecticut Rules of Professional Conduct. *See* Rule 1.1 of the Connecticut Rules of Professional Conduct, which provides that,

"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation necessary for the representation." The comment to that rule advises "[c]ompetent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation . . .". CONNECTICUT RULES OF COURT at 407 (West 2000).