## STATE OF CONNECTICUT *v.* JUAN CARLOS MUNOZ
## (15121)

PETERS, C. J., and BORDEN, BERDON, NORCOTT and HEIMAN, Js.

*(One justice concurring separately)*
Argued January 12—decision released May 9, 1995

*Temmy Ann Pieszak*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan*, state's attorney, and *Bruce Hudock*, senior assistant state's attorney, for the appellee (state).

BORDEN, J. The dispositive issue in this appeal is whether, under the circumstances of this case, the trial court's jury instruction regarding the element of cau-

sation of the death of the victim requires a new trial. The defendant, Juan Carlos Munoz, appeals[1] from the judgment of conviction, following a jury trial, of murder in violation of General Statutes § 53a-54a (a).[2] The defendant claims that: (1) the evidence was insufficient for conviction; (2) the trial court improperly instructed the jury regarding causation; (3) the probable cause hearing was flawed because (a) he was not provided with a separate interpreter to assist him in communicating with his counsel, and (b) the trial court used an incorrect standard in evaluating the evidence; (4) the trial court improperly admitted at trial the probable cause hearing testimony of a missing witness; and (5) the trial court improperly excluded at trial a prior inconsistent statement of a witness. We agree with the defendant's second claim, and reject his other claims. We therefore reverse the judgment and remand the case for a new trial.

The jury could have reasonably found the following facts. The victim, Mariano Herrera (Herrera), lived with his sister, Clara Inez Herrera, and her husband, Mario Arias, in Stamford. On May 28, 1990, the defendant, identifying himself as "Juan Carlos," telephoned their home four times looking for the victim, and was told that Herrera was not home but that a message would be relayed to him to telephone the defendant.

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] General Statutes § 53a-54a provides in relevant part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

On May 29, 1990, Herrera arrived home from his day job at approximately 6:30 p.m., and ate dinner at approximately 9:30 p.m. with his sister and brother-in-law. That evening was marked by torrential rains. At approximately 10 p.m., Manuel Cruz, a friend of Herrera's, drove Herrera from his house to his night job at a laundromat, stopping on the way at Herrera's request for Herrera to converse with the occupant of another car who Herrera had recognized. Cruz left Herrera at the laundromat, and when he returned later to pick up Herrera, the laundromat was open and unoccupied. After waiting for approximately one hour for Herrera to return, Cruz left.

At some time between 10 p.m., when Cruz left Herrera at the laundromat, and approximately 10:45 p.m., Herrera and the defendant met on the grounds of the Bishop Meadows condominium complex in Stamford. They engaged in a knife fight, in the course of which the defendant stabbed Herrera to death. The defendant then dragged Herrera's body approximately fifty feet up a slope and left it near a stone wall.

The defendant then drove to the home of his cousin, Gonzalo Garcia, arriving at approximately 10:45 p.m. The defendant was soaking wet, and his hands were severely cut and bleeding. The defendant told Garcia that he had been attacked by robbers in New York City, and asked Garcia to take him to a hospital in New York state. Garcia took him to United Hospital in Portchester, New York, for medical treatment. They returned to Garcia's home at approximately 2 a.m.

On May 30, 1990, at approximately 6:30 a.m., Herrera's body was discovered near the stone wall in the condominium complex. It bore three major stab wounds, in the chest, back and neck, and twenty-four superficial wounds, including defensive wounds. The three major stab wounds were the cause of his death.

Subsequently, the defendant gave the Stamford police two statements in which he told the police that he and Herrera had met not at the Bishop Meadows condominium complex, but at an area near Maple Avenue, under the Interstate 95 overpass. According to the defendant's statements, Herrera, who was accompanied by another person, and he had argued over whether the defendant would be a drug courier for Herrera. Herrera then produced a knife, and cut the defendant's hands when he put them over his face to protect himself. The defendant stated that he grabbed the knife, stabbed Herrera in the back, became scared, dropped the knife, and left in his car. He also stated that Herrera was "fine" when he left Herrera in the company of the other person.

The jury returned a verdict of guilty. After denying the defendant's postverdict motions for judgment of acquittal and for a new trial, the trial court, *Mottolese, J.*, rendered a judgment of conviction. This appeal followed.

I

We first consider the defendant's claim that the evidence was insufficient to convict him of murder, because if that claim is meritorious, all of his other claims are moot. We conclude, however, that the evidence was sufficient to sustain the verdict.

The defendant argues that there was insufficient evidence that he caused Herrera's death. Specifically, he argues that the proof of causation was insufficient "because the jury could only have reached its guilty verdict by rejecting the defendant's statement that Herrera was 'fine' when he left, and conclude the opposite, i.e., that the defendant inflicted all twenty-seven stab wounds." In support of this position, the defendant contends that the jury could not conclude, from a

rejection of his testimony that Herrera was fine when he left Herrera, that he inflicted any of the fatal wounds. We disagree.

The two part test for sufficiency of the evidence need not be repeated in detail. Succinctly stated, we construe the evidence to support the verdict, and determine whether the jury, based upon the cumulative effect of all that evidence and the inferences reasonably drawn therefrom, could have reasonably found as it did. *State v. Sivri*, 231 Conn. 115, 646 A.2d 169 (1994). Gauged by this standard, we conclude that the evidence was sufficient for the jury to infer that the defendant caused the fatal stab wounds to Herrera.

There was evidence, from both the defendant's statements to the police and the physical evidence, that the defendant and Herrera had engaged in a knife fight. There was evidence that the wounds to the defendant's hands, as well as wounds to Herrera's hand, knee and upper leg, were defensive wounds. The defendant's wounds, however, were not serious enough to preclude the probability that he could have held a knife in his hands. Of Herrera's twenty-seven wounds, twenty-four were superficial flesh wounds. According to the testimony of Arkady Katsnelson, the state medical examiner, the fact that there were wounds on the front and back of the body indicated that Herrera had moved about during the fight, and was alive for some period of time. The fatal stab wounds were those to the chest, back and neck.

In addition, Katsnelson testified that all of the wounds had been caused by "a single sharp edged knife." Furthermore, the defendant's statement was to the effect that he remembered stabbing Herrera once or twice in the back, but that he was too drunk at the time to recall specifically how many times he had stabbed Herrera.

Furthermore, there was evidence from which the jury could have inferred that the fatal stabbing occurred not under the highway overpass, but on the grounds of the condominium complex, approximately fifty feet from where Herrera's body was found. Edward S. Breakell, an assistant state medical examiner, testified that Herrera did not die at the precise location where his body was found and that his body had been moved to that location some time after death. Anita Levinson, a resident of the complex whose condominium was near where Herrera was stabbed according to the state's theory, testified to having heard loud male voices outside her condominium between 9:30 and 10 p.m. Herrera's keys were found on the roadway of the complex, approximately fifty feet from where the body was found. The condition of Herrera's body and clothing indicated that his body had been dragged backward from the approximate location of his keys on the roadway to the place, fifty feet away, where it was discovered.

Finally, "the state of mind that is characterized as 'guilty consciousness' or 'consciousness of guilt' is strong evidence that a defendant is indeed guilty." *State* v. *Moody,* 214 Conn. 616, 626, 573 A.2d 716 (1990). The defendant lied to his cousin and to the hospital personnel about the source of his injuries. Also, on June 4, 1990, the Stamford police first met with the defendant at the United Hospital, in Portchester, New York, where the defendant had gone for follow-up treatment for his wounds. At that time, the defendant lied to the police about how he had traveled to the hospital, and about the source of his wounds, repeating to them the story that he had been cut while being robbed in New York City.

The defendant then went with the police officers to police headquarters in Stamford. After the defendant repeated his story about the New York City robbery,

the police showed him a photograph of Herrera, and the defendant denied knowing him. The defendant then changed his story and stated that, on the night of May 30, 1990, he and a friend, whom he identified as Carlos Perez, went to meet Herrera for the purpose of refusing Herrera's offer to the defendant to become a drug courier for Herrera. According to this statement of the defendant, when he told Herrera of his refusal Herrera produced a knife, cut the defendant's hands as the defendant protected himself, and then the defendant left, never having cut or stabbed Herrera, and Perez stayed with Herrera.

When the police told the defendant that they did not believe him, the defendant then gave a different statement. In this version, he stated that he had gone to meet Herrera because Herrera had a friend who wanted the defendant to become a drug courier. Under this version, Cruz was the friend who had accompanied Herrera to the meeting. When the defendant told Herrera that he did not want to become a drug courier, Herrera became angry, pulled out a knife, and attacked the defendant. According to the defendant, after protecting his face with his hands he grabbed the knife from Herrera, stabbed Herrera once or twice in the back, became scared, dropped the knife, and left in his car.

Moreover, there was evidence that the defendant told a fellow prisoner in the Stamford police lockup that he had "big problems now," and that he expected "to do about ten years for this." In addition, the police testified that, after the defendant had given his final statement, admitting for the first time to having stabbed Herrera, he said that "he had a weight lifted from his shoulders."

Based on the evidence, the jury could have reasonably found that the defendant inflicted all of Herrera's

wounds, including the fatal wounds. Contrary to the assertion of the defendant, this finding had more of an evidentiary basis than simply a rejection of the defendant's statement that Herrera was "fine" when the defendant left him. The jury could have reasonably concluded that the defendant, after suffering defensive wounds to his hands, succeeded in taking the knife from Herrera and then engaging in a course of assault on Herrera, resulting in the twenty-four superficial wounds and the three fatal wounds.

## II

The defendant also claims that the trial court improperly failed to instruct the jury regarding the element of causation of Herrera's death in accordance with the defendant's request to charge. The defendant claims that the court's inadequate instruction deprived him of his constitutional right to have the jury properly instructed on an element of the crime and that, gauged by the appropriate constitutional standard, the instruction constituted harmful error. We agree.

In order to place this claim in its proper context, it is necessary to focus on the defendant's theories of defense, as disclosed by the thrust of his cross-examination of the state's witnesses, by his one witness, and by his final argument to the jury.[3] He had two, albeit not entirely consistent, theories: (1) self-defense;[4] and (2) alibi.[5] A necessary component of the defendant's alibi defense was the notion that, in the presence of

---

[3] The defendant did not testify.

[4] The first theory, self-defense, is not related to the defendant's claim regarding the jury instruction on causation. That theory specifically presupposed, according to the defendant's argument to the jury, that the defendant had caused Herrera's death, but posited that he had done so in justified self-defense. The defendant does not challenge the trial court's instructions regarding self-defense.

[5] Although the law permits, for reasons of policy, the assertion of inconsistent defenses, such as self-defense and alibi, and although lawyers and

a third person, he had fought with Herrera under the highway overpass, left Herrera wounded but not fatally so, and that someone else, presumably the third person, inflicted the fatal wounds and later transported Herrera's body to the condominium complex. Thus, under this version of what had occurred, the defendant was somewhere else, namely, either at the hospital or at Garcia's house, when Herrera was killed.

The defendant's alibi defense was based, in part, on uncertainty in the evidence regarding the time of Herrera's death. There was evidence, based on an analysis by Katsnelson of the contents of Herrera's stomach, from which the jury could have concluded that Herrera died at approximately 1 a.m., when the defendant was at the hospital in Portchester. Katsnelson testified that Herrera died not more than two and one-half to three hours after his last meal. The other part of the defendant's alibi defense, namely, that someone other than the defendant inflicted the fatal wounds after the defendant had fled from the fight scene under the highway overpass, was based on the following evidence and arguments of the defendant to the jury.

The defendant's statement, read in a light favorable to him, indicated that when he met Herrera and the third person under the overpass at some time between 10 and 10:45 p.m., he and Herrera had fought, and that he had stabbed Herrera, but that Herrera was not fatally wounded when he fled. Although the police, several days later, unsuccessfully searched the area under the overpass for the knife and for other evidence of a bloody and fierce knife fight, their failure to find any such evidence arguably was explained by the torren-

judges are accustomed to dealing with such defenses independently of each other, one must wonder about the effect on a thoughtful jury of the simultaneous claims that "I did it in self-defense," and "I was not there at the time."

tial rains that could have washed away the evidence, and by the possibility that someone else picked up the knife.

In addition, there was evidence from which the jury could have found, and the defendant argued to the jury, that Herrera's body had been transported to the condominium complex during the early morning hours, when the defendant was back at Garcia's house. Edmund H. Miller, a resident of the complex whose condominium was approximately seventy feet from where Herrera's body was discovered, testified that during the night of May 29–30, 1990, he was awake until approximately 2 a.m., that he heard no voices or noises out of the ordinary, and that his dog, which ordinarily barked when quiet is interrupted by noise, was silent.

In addition, there was no forensic evidence to support the state's theory that Herrera had been stabbed at the place on the condominium complex roadway from which his body had been dragged fifty feet to the stone wall. The presence of his keys at that location, together with the condition of his body and clothing, suggested that his body had been dragged from that location, and Breakell testified that Herrera had not died at the location where his body had been found. Breakell did not testify, however, that Herrera had died at the location from which his body had been dragged, and the torrential rains on the night in question could have explained any lack of blood or other evidence at that location.

Furthermore, traces of blood on the defendant's jacket were consistent only with his blood type, and a search of the defendant's car disclosed no evidence of Herrera's blood. Although there was considerable evidence of blood in the car, all of it was consistent with only the defendant's blood type, and inconsistent with Herrera's. This evidence supported a potential infer-

ence that someone other than the defendant had transported Herrera's body from the overpass area, where the defendant said he had stabbed Herrera, to the condominium complex where Herrera's body was found.

Against this evidentiary background, the defendant filed the following request to charge on the element of causation: "The second element is that the defendant, acting with that intent to cause the death of another person, caused the death of that person. This means that the defendant's conduct was the proximate cause of the victim's death. An act or omission to act is the proximate cause of death when it substantially and materially contributes in a natural and continuous sequence, *unbroken by an intervening cause,* to the resulting death. It is the cause without which the death would not have occurred, and it is the predominating cause, the substantial factor, from which death followed as a natural, direct and immediate consequence. It is not necessary that the particular kind of harm that results from the defendant's act be intended by him. Where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible. . . .

"With regard to this element of the crime it is important for you to consider the testimony of Dr. Katsnelson that the cause of death was multiple stabbing of the head, neck and chest, as well as the testimony of Officers [Eva] Maldonado and [Peter] diSpagna, that the defendant described only one stab of the back." (Emphasis added.)

The trial court declined to instruct the jury in accordance with the defendant's request to charge. In its instructions on causation, the court first read the statutory language of § 53a-54a (a) that "[a] person is guilty

of murder when, with the intent to cause the death of another person, he causes the death of such person," and then elaborated that this meant that the state was required to prove beyond a reasonable doubt that the defendant, acting with the requisite intent, "in fact caused the death of Mariano Herrera."

The court then stated: "In order to convict him of murder—this defendant of murder . . . you must first find that he caused the death of Mariano Herrera, and you must find proved beyond a reasonable doubt, that Mariano Herrera died as a result of this defendant's actions.

"Now, you have heard testimony about the number of wounds inflicted on the victim's body. You also heard testimony about at least one wound and possibly a second wound, which the defendant has admitted to having inflicted. I have to tell you that it is not essential that the wound or wounds inflicted by the defendant, be the sole cause of the victim's death. It is sufficient if the wound or wounds . . . has or have been a substantial factor in causing his death. It's up to you to decide whether there was one or two wounds, or many wounds—or one, two, or more wounds inflicted by this defendant."[6]

---

[6] Similarly, in instructing on the causation element of the lesser included offenses of manslaughter under General Statutes § 53a-55 (a) (1) and (3), the court stated: "[I]t is not essential that the wound or wounds inflicted that you find the defendant inflicted upon the victim be the sole cause of death. It is sufficient if it or they have been a substantial factor in causing the death."

In addition to having filed his request to charge, the defendant excepted to the charge on causation: "[O]f course we've discussed this, but you use the phrase 'not the sole cause substantial factor,' and used it [in] all the lesser included charges, and there's no definition of substantial factor. And I'm concerned about the confusion that they may cause." The trial court responded: "They may come back and ask me for it." The defendant stated: "Well, I don't think we ought to wait for that. I really think that the Court ought to give a definition of substantial factor to have it make any sense." The court answered: "I thought about it. You're right. We have talked about

The defendant's claim[7] requires us to determine, in light of the evidentiary basis for his alibi defense

it and I decided not to do it, just let it stand with—we'll see what happens in the event they do come back with—." The defendant then stated: "Well, for the record, I think I would take exception . . . to not giving a definition."

Subsequently, the jury requested to be reinstructed on the lesser included offenses. In complying with that request, the trial court repeated its earlier instructions on causation. The defendant repeated his earlier exception: "It has again, to do with the issue of substantial factor and sole cause, and I still think there's confusion unless Your Honor defines that term."

In the course of his colloquy with the trial court on his postverdict motion for a new trial, the defendant stated: "What I was asking for was that the act or omission is the proximate cause of when it substantially and materially contributed in a natural and continuous sequence, unbroken by an intervening cause to the resulting death. . . . I don't think that element was submitted to them." The court responded: "Yes, no. You're absolutely right. I declined to give that charge for I think, good reason."

[7] In his brief on this appeal, the defendant focused his argument not on the lack of any reference to an intervening cause in the trial court's instruction, but on the use of the phrase "*a* substantial factor," (emphasis added) rather than "*the* substantial factor," (emphasis added) as purportedly required under our decision in *State* v. *Spates*, 176 Conn. 227, 233–34, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979). At oral argument in this court, however, the defendant shifted the focus of his argument to the portion of the definition of proximate cause, as stated in *Spates*, as the cause that "substantially and materially contributes, in a natural and continuous sequence, *unbroken by an efficient, intervening cause*, to the resulting death." (Emphasis added.) Id., 234.

As we explain in the text, our recent decision in *State* v. *Leroy*, 232 Conn. 1, 653 A.2d 161 (1995), disposes of the defendant's claim as articulated in his brief. We nonetheless consider the defendant's claim as ultimately articulated at oral argument, namely, that the trial court improperly failed to instruct the jury on the concept of intervening cause, for the following reasons. First, *Leroy* supports his claim as articulated at oral argument. Furthermore, we do not perceive any significant prejudice to the state by considering the defendant's claim as presented in oral argument, because the state was fully able to respond thereto in oral argument, and because, in any event, the two concepts—the defendant's conduct as a substantial factor in causing the victim's death, and whether that conduct was broken by an efficient, intervening cause—are closely related to each other. Finally, our review of the trial court record convinces us that the defendant did not confine his claim in the trial court to the difference between "the" and "a" substantial factor, but, by both his request to charge and his colloquies with the trial court, claimed that a reference to an intervening cause was required. See footnote 6.

described above, whether: (1) the trial court's failure to include an instruction on intervening cause was improper; and, if so, (2) the impropriety requires a new trial. We answer both these inquiries in the affirmative.

We analyze these questions against the familiar backdrop of two fundamental principles. First, whether a jury instruction is improper is gauged by considering the instruction in its entirety, and with reference to the facts and evidence in the case, so as to determine whether it fairly presented the case to the jury so that no injustice was done under established legal rules. *State* v. *Leroy*, 232 Conn. 1, 7–8, 653 A.2d 161 (1995); *State* v. *Dinoto*, 229 Conn. 580, 642 A.2d 717 (1994). Second, if an instruction regarding an element of the crime charged is improper, in order to regard the impropriety as harmless we must be convinced beyond a reasonable doubt that it did not affect the jury's verdict. *State* v. *Coleman*, 14 Conn. App. 657, 678–81, 544 A.2d 194, cert. denied, 208 Conn. 815, 546 A.2d 283 (1988). Put another way, we must be convinced that there is no reasonable possibility that the impropriety in the instruction affected the jury's verdict. *State* v. *Chapman*, 229 Conn. 529, 543, 643 A.2d 1213 (1994); *State* v. *Cerilli*, 222 Conn. 556, 584 n.16, 610 A.2d 1130 (1992).

Very recently, in *State* v. *Leroy*, supra, 232 Conn. 8, we reviewed "our cases that have discussed proximate causation in criminal prosecutions." The context of that review was a claim by the state that the Appellate Court had misapplied our language in *State* v. *Spates*, 176 Conn. 227, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979), in which we had stated that, in order to satisfy the causation element of a crime, a defendant's conduct must have been "*the* substantial factor," or "*the* predominating cause" of the victim's injuries. (Emphasis added.) *State* v. *Leroy*, supra, 6. The Appellate Court had

reversed the defendant's conviction because the trial court had instructed the jury that the defendant's conduct must have been " '*a* substantial factor' " of the victim's injuries. (Emphasis in original.) *State* v. *Leroy,* supra, 6–7.

In sustaining the state's claim in *Leroy*, we held that the proper formulation of the rule of law, and therefore of the underlying requirements of a proper jury instruction on proximate cause, was as follows: "[W]hen several factors contribute, in a chain of events, to cause a victim's injury, in order to be the proximate cause of that injury, the defendant's conduct must have been a cause that necessarily set in operation the factors that accomplish the injury. In short, *a jury instruction with respect to proximate cause must contain, at a minimum, the following elements: (1) an indication that the defendant's conduct must contribute substantially and materially, in a direct manner, to the victim's injuries; and (2) an indication that the defendant's conduct cannot have been superseded by an efficient, intervening cause that produced the injuries."* (Emphasis added.) Id., 13. Furthermore, although the language regarding the requirement that the defendant's conduct not be superseded by an intervening cause was not the focus of the state's claim in *Leroy*, the basis of that part of our holding was a careful review of our previous cases regarding proximate causation in cases that involved the potential that more than one cause resulted in the victim's injuries. Id., 10–13.[8]

---

[8] We emphasize that, as *State* v. *Leroy*, supra, 232 Conn. 13, suggests, the requirement of language in the jury instructions regarding an efficient, intervening cause is not ironclad. It arises in those cases in which the evidence could support a finding by the jury that the defendant's conduct was overcome by an efficient, intervening cause, or in which the evidence regarding proximate causation was such that, based on the doctrine of efficient, intervening cause, the jury could have a reasonable doubt about the defendant's guilt. Thus, in the general run of cases, in which the evidence is susceptible of a finding of only one cause of the harm contemplated by the

Accordingly, we conclude that the jury instruction in this case was improper because the court did not indicate that, for the defendant to be found guilty, "the defendant's conduct cannot have been superseded by an efficient, intervening cause that produced" Herrera's death. Id., 13. The evidence described previously, viewed favorably to the defendant, as we must in deciding this issue, was susceptible of any of the following determinations by the jury: (1) the defendant's stabbing of Herrera did not in any way cause Herrera's death because that stab wound was not fatal, all of the fatal stab wounds having been inflicted by someone else after the defendant had fled; (2) although the defendant stabbed Herrera under the highway overpass, and although that stabbing may have contributed substantially and directly to Herrera's death by virtue of providing one of the ultimately fatal stab wounds, some third party's conduct in inflicting additional stab wounds, in the defendant's absence, was so significant that it amounted to an efficient, intervening cause; or (3) although the defendant stabbed Herrera under the highway overpass, the state's proof of whether that stabbing, as opposed to the stabbing of Herrera by someone else after the defendant had fled, resulted in Herrera's death was sufficiently inconclusive as to give rise to a reasonable doubt, based on the doctrine of efficient, intervening cause, about whether the defendant's conduct was the proximate cause of Herrera's death.

The first potential determination described above was sufficiently covered by the trial court's instruction as

statute, a statement in the jury instruction referring to an efficient, intervening cause might well be unnecessary. In other cases, however, such as this case, where the evidence would support a finding by the jury that the defendant's conduct, although a "but for" cause of the victim's injuries, may nonetheless have been overcome by an efficient, intervening cause, or may nonetheless provide a basis for a reasonable doubt as to the effect of the defendant's conduct, an appropriate instruction on the doctrine of intervening cause is required.

given, and would be encompassed by the requirement in *Leroy* that the instruction indicate that the defendant's conduct "must contribute substantially and materially, in a direct manner, to the victim's injuries." Id., 13. The second and third potential determinations, however, were not sufficiently covered by the trial court's instructions, and required an instruction indicating that in order for the defendant to be found guilty, "the defendant's conduct cannot have been superseded by an efficient, intervening cause that produced" Herrera's death. Id. Furthermore, there is nothing else in the court's instructions, read in their entirety, that filled this gap.

We cannot conclude, moreover, that there is no reasonable possibility that the inadequacy of the court's instruction affected the jury's verdict. As the state concedes, the state's case was not overwhelming. This was not a case in which, because of the strength of the state's case, a jury's acceptance of the state's evidence would have led ineluctably to rejection of the defendant's theory of defense. Indeed, as our discussion above indicates, one of the potential determinations by the jury, based on the defendant's theory of defense, could have been a reasonable doubt about who caused Herrera's death. Furthermore, the defendant's version of the events, although perhaps somewhat implausible, was not so bizarre that it fell beyond the bounds of the credible.

Moreover, in his final argument to the jury the defendant in effect argued his theory of defense that relied on the notion of an intervening cause of Herrera's death. Although in that argument the defendant did not specifically use the phrase "efficient, intervening cause," one of the thrusts of that argument was that it was plausible that someone other than the defendant caused Herrera's death, and, therefore, he should not be held responsible. The state, in its rebuttal, under-

stood the defendant's argument to have been that, after the defendant had stabbed Herrera, someone else "finished the job" and transported Herrera's body to the condominium complex.

Because our determination of this issue requires a new trial, on the remand the trial court will be required to include an appropriate instruction to the jury on the doctrine of efficient, intervening cause. Although our case law has referred to that doctrine, those cases have not focused on the contours of that doctrine. We take this occasion, therefore, to elaborate somewhat on that doctrine as it applies to a criminal case in order to provide some guidance to the trial court.

The doctrine of intervening cause,[9] which has deep roots in the law of proximate cause, both criminal and civil, has been referred to several times in our case law. See *State* v. *Leroy*, supra, 232 Conn. 13; *State* v. *Spates*, supra, 176 Conn. 234; *State* v. *Alterio*, 154 Conn. 23, 30, 220 A.2d 451 (1966) ("independent and efficient cause"); *State* v. *Leopold*, 110 Conn. 55, 62, 147 A. 118 (1929) (same); *State* v. *Malines*, 11 Conn. App. 425, 433, 527 A.2d 1229 (1987) ("independent intervening force"). It refers to a situation in which the defendant's conduct is a "but for" cause, or cause in fact, of the victim's injury, but nonetheless some other circumstance subsequently occurs—the source of which may be an act of the victim, the act of some other person, or some nonhuman force—that does more than supply a concurring or contributing cause of the injury, but is unforeseeable and sufficiently powerful in its effect that it serves to relieve the defendant of criminal responsibility for his conduct. See generally 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.12 (f) (3). Thus, the doctrine serves as a dividing line

---

[9] We use the phrase "intervening cause" as a shorthand for the more standard phrase, "efficient, intervening cause," used generally in our case law.

between two closely related factual situations: (1) where two or more acts or forces, one of which was set in motion by the defendant, combine to cause the victim's injuries, in which case the doctrine will not relieve the defendant of criminal responsibility; and (2) where an act or force intervenes in such a way as to relieve a defendant, whose conduct contributed in fact to the victim's injuries, from responsibility, in which case the doctrine will apply. See *D'Arcy* v. *Shugrue*, 5 Conn. App. 12, 25, 496 A.2d 967, cert. denied, 197 Conn. 817, 500 A.2d 1336 (1985).[10] Furthermore, in a case in which the evidence, viewed in favor of the defendant, justifies an instruction on the doctrine of intervening cause; see footnote 8; it will ordinarily be a question of fact for the jury, to be resolved pursuant to appropriate instructions by the trial court, whether the subsequent circumstance constitutes a concurring or contributing cause, in which case the defendant will not be relieved of criminal responsibility, or an efficient, intervening cause, in which case he will be so relieved. See *State* v. *Malines*, supra, 433; *D'Arcy* v. *Shugrue*, supra, 30.

These principles are illustrated by *State* v. *Alterio*, supra, 154 Conn. 30. In that case, a vehicular homicide prosecution, the defendant and another person engaged in an automobile race, as a result of which the

---

[10] In this respect, the criminal doctrine of intervening cause shares a component of its civil counterpart, the doctrine of superseding cause. See *D'Arcy* v. *Shugrue*, supra, 5 Conn. App. 24 (" '[a] superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about' "). We do not suggest by this analogy to the civil law of proximate cause, however, that all of the aspects of that law automatically apply to the criminal law of proximate cause. Obviously, the two bodies of law share some commonalities. At the same time, however, because they also have different aims—shifting economic loss, as against assessing criminal responsibility—they may not share other aspects of the law of proximate cause. We leave the question of the degree of congruence or disparity between the two doctrines to a case that presents that particular issue.

other person's car collided at an intersection with a car driven by Harold DeSanty, Jr., in which the fatal victim, Harold DeSanty, Sr., was a passenger. Id., 25. The defendant had unsuccessfully requested the trial court to charge the jury that he must be acquitted if Harold DeSanty, Jr., had been negligent. Id., 29. On appeal, this court rejected the defendant's claim that he was entitled to that instruction. We stated: "The only bearing which the conduct of the driver of the DeSanty car could have upon the result . . . would relate to the issue of causation. This issue formed the substance of two other of Alterio's requests to charge.

"It was the state's burden to prove that a proximate cause of the death was the unlawful acts of the defendants or of either of them. *State* v. *Leopold*, [supra, 110 Conn. 62]; *State* v. *Campbell*, [82 Conn. 671, 675, 74 A. 927 (1910)]. Consequently, under the circumstances of this accident, *only if the conduct of the driver of the DeSanty car was shown to be the independent and efficient cause of his father's death would the state fail to meet its burden.* If, however, the requisite causal connection was established between an unlawful act of either of the defendants and the death, then both defendants, who joined in the common design to commit the unlawful act, would be responsible. *State* v. *McCarthy*, 133 Conn. 171, 173, 49 A.2d 594 [1946]; *State* v. *Leopold*, supra, [110 Conn.] 63.

"Every person is held to be responsible for the natural consequences of his acts, and if he commits a felonious act and death follows, it does not alter its nature or diminish its criminality to prove that other causes co-operated to produce that result. *State* v. *Leopold*, supra, [110 Conn.] 61. It was incumbent upon the court, therefore, to point out to the jury that in order to establish the guilt of the defendants the state was required to prove the essential element of causation and the effect of participation by Alterio in the common under-

taking which ended fatally." (Emphasis added; internal quotation marks omitted.) *State* v. *Alterio*, supra, 154 Conn. 29–30.

Thus, in *Alterio*, the court indicated that, where the defendant's conduct combined with that of another to cause the victim's death, the defendant was not relieved from responsibility. The court also suggested, however, that if the conduct of the driver of the car in which the victim had been a passenger had been sufficient to overcome the causative effect of the defendant's conduct, that conduct could have been an "independent and efficient cause of [the victim's] death," in which case the state would not have met its burden on the element of proximate cause.

Although we have concluded that a new trial is required, the defendant raises other claims that are likely to arise on the new trial. We therefore turn to the defendant's remaining claims.

### III

The defendant claims that the hearing in probable cause held pursuant to General Statutes § 54-46a[11]

[11] General Statutes § 54-46a provides: "PROBABLE CAUSE HEARING FOR PERSONS CHARGED WITH CRIMES PUNISHABLE BY DEATH OR LIFE IMPRISONMENT. (a) No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause.

"(b) Unless waived by the accused person or extended by the court for good cause shown, such preliminary hearing shall be conducted within sixty days of the filing of the complaint or information in superior court. The court shall be confined to the rules of evidence, except that written reports of expert witnesses shall be admissible in evidence and matters involving chain of custody shall be exempt from such rules. No motion to suppress or for discovery shall be allowed in connection with such hearing. The accused person shall have the right to counsel and may attend and, either

before *Katz, J.*, was flawed in two respects: (1) he was not provided with an interpreter to assist him in communicating with his counsel; and (2) the court improperly used a quantitative, rather than a qualitative, standard in arriving at its determination of probable cause. We disagree with each of these claims.[12]

## A

The defendant, who is primarily Spanish speaking, claims that, because there was only one Spanish-English interpreter at the probable cause hearing, the lack of a second interpreter whose duties were devoted solely to interpreting between him and his counsel deprived him of a fair and valid probable cause hearing.[13] Under the circumstances of this case, we disagree.

individually or by counsel, participate in such hearing, present argument to the court, cross-examine witnesses against him and obtain a transcript of the proceedings at his own expense. At the close of the prosecution's case, if the court finds that, based on the evidence presented by the prosecution, probable cause exists, the accused person may make a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered. The court shall not allow the accused person to present such evidence unless the court determines that such evidence would be sufficient to rebut the finding of probable cause.

"(c) If, from the evidence presented pursuant to subsection (b) of this section, it appears to the court that there is probable cause to believe that the accused person has committed the offense charged, the court shall so find and approve the continuance of the accused person's prosecution for that offense. A determination by the court that there is not probable cause to require the accused person to be put to trial for the offense charged shall not operate to prevent a subsequent prosecution of such accused person for the same offense."

[12] Because we reject the defendant's challenges to the probable cause hearing, we have no occasion to reconsider our earlier holdings that a flawed probable cause hearing deprives the court of personal jurisdiction to try the defendant. See *State* v. *Boyd*, 214 Conn. 132, 135, 570 A.2d 1125 (1990), on appeal after remand, 221 Conn. 685, 689 n.5, 607 A.2d 376, cert. denied, 506 U.S. 923, 113 S. Ct. 344, 121 L. Ed. 2d 259 (1992); *State* v. *McPhail*, 213 Conn. 161, 170, 567 A.2d 812 (1989); *State* v. *Mitchell*, 200 Conn. 323, 336, 512 A.2d 140 (1986); see also *State* v. *Greenfield*, 228 Conn. 62, 74 n.13, 634 A.2d 879 (1993).

[13] The defendant does not raise the same claim regarding the trial, at which he was provided with a separate interpreter. We also note that the

The record discloses the following. At the outset of the probable cause hearing, the following colloquy occurred: the assistant state's attorney informed the court that they might have "language difficulties" because he had brought in an interpreter "for purposes of . . . interpreting for witnesses. I did not ask the interpreter, I brought in, to be the defendant's personal interpreter." The court replied: "He's going to have to move his seat." The assistant state's attorney stated that he would request the interpreter "to interpret for witnesses. So he will be doing double duty. I will alert the court." The court responded: "All right. Basically, since his job is to be a voice, he'll repeat the questions in Spanish, loud enough." The assistant state's attorney replied: "I'm just letting the court know that the state did not arrange for a personal interpreter for the defendant." The court stated: "I understand. Thank you." The assistant state's attorney stated: "Obviously, we have to . . . make do with this." The court then addressed the defendant's counsel: "I don't anticipate any prejudice to the defendant, do you, Mr. Rosenblum?" The defense counsel replied: "No, Your Honor. I think we can make it."

The hearing then proceeded. There were seven witnesses. Three of the witnesses testified in English, and four testified in Spanish through the interpreter. The last witness was officer Peter diSpagna of the Stamford police department. He testified to his part in the investigation of the homicide, including the various statements that the defendant had made to the police.

diSpagna testified further that the dialogue between the police and the defendant had been conducted in both Spanish and English. He stated that Eva Maldonado, a Spanish speaking Stamford police officer, acted as

same attorney represented the defendant at both the probable cause hearing and the trial.

an interpreter for the defendant: "[I]f the question became very complex, or [the defendant] didn't understand something that we were asking, the interpreter would then try to explain it a little bit better." diSpagna also testified that "the impression we had was that [the defendant] understood English, okay, not as well as we would like him to have understood it, and there were some things that he would then ask the interpreter to explain if he himself couldn't understand it." When it came to advising the defendant of his *Miranda*[14] rights, however, diSpagna testified, "we felt it best that Spanish should be used during the advising of the rights, this way there would be no question at all."

At the trial, there was further evidence regarding the defendant's bilingual ability. Maldonado testified that, during the questioning of the defendant, the questions were posed to him in English, that he would respond in English, and that it was only when the defendant "needed help" with the language that he would turn to her for help, but that "he would try himself also."[15] Maldonado also testified that, after she had placed the defendant in a cell, she had overheard him say, in Spanish, to another prisoner: "I made believe that I didn't know English and they had somebody speak—translate for me."

diSpagna, who does not speak Spanish, testified at the trial that, when he first interviewed the defendant at the hospital in Portchester, the defendant responded to diSpagna's questions in English, and related to

[14] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[15] Maldonado's testimony in this regard was not, however, fully consistent. She also testified that, during the questioning regarding his second statement to the police, she posed the questions to him in Spanish, that his responses were in a "mix" of Spanish and English, and that "he could speak a little English."

diSpagna where he currently and previously had lived. diSpagna also testified that, when that conversation became more complicated and there appeared to be a language difficulty, they secured a Spanish interpreter, and the defendant responded in both Spanish and English.

The defendant argues that the failure of the probable cause court to provide him with a separate interpreter, in order to permit him to communicate with his counsel, deprived him of his federal constitutional rights of confrontation, to consult with his counsel, and to be present at his own trial.[16] He contends that such an interpreter was necessary for him to communicate with his counsel while the testimony of Spanish speaking witnesses[17] was being translated for the court and,

[16] The defendant also claims that the failure to provide him with a separate interpreter deprived him of his federal and state constitutional rights to equal protection of the law, because General Statutes § 46a-33 (b) (1), he argues, provides for such an interpreter for a hearing impaired person. The defendant has failed to provide an adequate analysis of either such constitutional provision, as applied to the facts of this case. We therefore decline to consider these claims. See *Commissioner of Health Services* v. *Youth Challenge of Greater Hartford, Inc.*, 219 Conn. 657, 659 n.2, 594 A.2d 958 (1991); *McGaffin* v. *Roberts*, 193 Conn. 393, 399 n.6, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985).

The defendant also claims that the failure to provide him with a separate interpreter at the probable cause hearing deprived him of the effective assistance of counsel. We have consistently held, however, that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such claim. *State* v. *Leecan*, 198 Conn. 517, 541, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986).

We therefore confine our analysis to his claim regarding the rights of confrontation, to consult with counsel, and to be present at his trial, under the United States constitution.

[17] The defendant does not claim any constitutional deprivation regarding the testimony of the English speaking witnesses at the probable cause hearing. Presumably this is because, while those witnesses were testifying, the court's interpreter in effect acted as a separate interpreter for the defendant in translating their testimony into Spanish and facilitating communication between the defendant and his counsel regarding that testimony. This rendition of the record would be consistent with the trial court's remark

thereby, to assist his counsel so as to enable his counsel effectively to cross-examine those witnesses.[18]

Because, as the state accurately asserts, this claim was not made in the trial court,[19] we consider whether the defendant may prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). We conclude that he may not because his claim founders on the third prong of *Golding*, namely, that a constitutional violation exists that deprived the defendant of a fundamentally fair probable cause hearing.[20] Id., 240.

In the context of a claim by a criminal defendant that "the federal constitution required continuous interpretation during his custodial interrogation," we have stated in dictum that "[t]he federal due process clause requires continuous translations at trial when a non-English speaking defendant cannot understand or appreciate the proceedings. *Luna* v. *Black*, 772 F.2d 448, 451 (8th Cir. 1985); *United States ex rel. Negron* v. *New York*, 434 F.2d 386, 389 (2d Cir. 1970); cf. 28 U.S.C. § 1827 (1988) (Court Interpreters Act). Failure

that the interpreter would be required to "move his seat," and with the assistant state's attorney's remark that the interpreter would be required to do "double duty."

[18] The defendant attempts to bolster his claim by arguing that special harm ensued from the fact of a possible inaccuracy in the translation of a particular Spanish phrase, used by the telephone caller to the defendant's home the night before the murder, supplied by the interpreter at the probable cause hearing. Suffice it to say that we have examined both of the proffered translations of the phrase in question, and find them sufficiently close to each other in meaning that any difference between the two translations could not have had any effect on the outcome of either the probable cause hearing or the trial.

[19] We note that, at the probable cause hearing, the defendant's counsel, although not the defendant himself, specifically acquiesced in the lack of a separate interpreter, and that the defendant did not raise this claim in his postverdict motion for a new trial.

[20] We assume without deciding that, for purposes of the federal confrontation clause, deprivation of the right of confrontation at a probable cause hearing that was not replicated at the trial on the merits would, nonetheless, constitute a federal constitutional violation.

to provide continuous word-for-word translation will render a trial fundamentally unfair, however, only on a showing of abuse. *Valladares* v. *United States*, 871 F.2d 1564, 1566 (11th Cir. 1989); see also *United States* v. *Joshi*, 896 F.2d 1303, 1309 (11th Cir.), cert. denied sub nom. *Panchal* v. *United States*, 498 U.S. 986, 111 S. Ct. 523, 112 L. Ed. 2d 534 (1990). On at least one occasion, a federal court has extended to pretrial hearings the requirement of continuous translations for criminal defendants who cannot understand or appreciate the proceedings. *United States* v. *Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985).'' (Internal quotation marks omitted.) *State* v. *Roman*, 224 Conn. 63, 69, 616 A.2d 266 (1992), cert. denied, 507 U.S. 1039, 113 S. Ct. 1868, 123 L. Ed. 2d 488 (1993).

There is persuasive authority that, under appropriate circumstances, a defendant's right to confrontation, his right to counsel and his right to be present at trial may be violated if he is not provided with a separate interpreter, who performs the functions of translating for him, into his language, the testimony of English speaking witnesses and interpreting between him and his English speaking counsel during the testimony of all witnesses, both English and nonEnglish speaking. See, e.g., *United States ex rel. Negron* v. *New York*, supra, 434 F.2d 396; *United States ex rel. Navarro* v. *Johnson*, 365 F. Sup. 676, 681 (E. D. Pa. 1973); see also *United States* v. *Cirrincione*, supra, 780 F.2d 633–35; *People* v. *Carreon*, 151 Cal. App. 3d 559, 198 Cal. Rptr. 843 (1984). A critical factual underpinning of these constitutional requirements, however, as disclosed by those authorities, is that the defendant has so limited an understanding or ability to speak English that his ability to comprehend the proceedings and to communicate with his counsel is significantly impaired.[21] Thus,

---

[21] Constitutional considerations aside, it is the better practice for a trial court to provide a defendant who needs an interpreter with a separate inter-

the basic constitutional inquiry is "whether any inadequacy in the interpretation made the trial fundamentally unfair"; (internal quotation marks omitted) *United States* v. *Joshi*, supra, 896 F.2d 1309; and the failure to provide continuous, word-for-word translation will require a new trial only upon such a showing of fundamental unfairness. *Valladares* v. *United States*, supra, 871 F.2d 1566.

Gauged by these standards, and on the basis of the record before us, we conclude that the failure to provide the defendant with a separate interpreter at the probable cause hearing did not deprive him of his right of confrontation, his right to consult with his counsel, or his right to be present at the hearing. That failure did not render the probable cause hearing fundamentally unfair, and the probable cause court did not act improperly by proceeding as it did.

Unlike the factual situations presented in the cases cited previously, this record does not disclose that the defendant did not adequately understand or could not adequately communicate in English. At worst, he spoke both Spanish and English, with English as his second language. At best, there was evidence to the effect that he adequately understood and could communicate in English, and that his need for an interpreter was a sham.

Finally, in this case the same attorney represented the defendant at both the probable cause hearing and the trial. Thus, he was in a position to compare the defendant's ability to communicate with him and his ensuing ability to cross-examine witnesses at the probable cause hearing, when there was no separate interpreter, with the situation at the trial, when there was such an interpreter. When, after the trial on the merits,

preter at both a probable cause hearing and trial, as occurred in the trial on the merits in this case.

the defendant's counsel moved for a new trial, he did not claim that the lack of a separate interpreter at the probable cause hearing had impaired the defendant's right of confrontation, his right to consult with counsel or his right to be present at the hearing. We can infer, therefore, that the defendant's counsel perceived no significant difference between the two proceedings in these respects.

## B

The defendant also claims that the probable cause hearing was fatally flawed because the probable cause court used an improper standard in evaluating the evidence. Therefore, the defendant argues, "the finding . . . is invalid, and a new [hearing] is required." We agree with the defendant that the court used an improper standard. We also conclude, however, that the impropriety inured to the defendant's benefit, rather than to his detriment, and that, therefore, the court's finding of probable cause was not so flawed as to require a new hearing.

The probable cause court found that the state had established, by a preponderance of the evidence, that the defendant had committed the murder of Herrera.[22] This was an improper standard of proof, because probable cause is not the same as a preponderance of the evidence. This impropriety, however, could not have harmed the defendant, because proof of probable cause requires less than proof by a preponderance of the evidence. *In re Keijam T.*, 221 Conn. 109, 115, 602 A.2d

---

[22] The court stated: "Preponderance of the evidence is 51 percent standard of proof. In fact, the State's asking me to find by 51 percent, that [the defendant] committed this crime, and defense in effect, is asking me by 51 percent, to find that the other person in the car finished off the victim. And while there's evidence to support the State's request, there's no evidence to support the Defendant's request. . . . [B]ased on the evidence that's been presented to me, I can find by a preponderance of the evidence . . . [the defendant's] responsibility in this, again, by 51 percent."

967 (1992); see also *State* v. *Davis*, 229 Conn. 285, 295, 641 A.2d 370 (1994). The court's finding by a preponderance of the evidence, therefore, necessarily also encompassed a finding by the less demanding standard of probable cause.

## IV

The defendant also challenges two evidentiary rulings made during the trial on the merits. He claims that the trial court improperly: (1) admitted at trial the transcript of the probable cause hearing testimony of Cruz, who was unavailable as a witness at the time of the trial; and (2) excluded at trial a purported prior inconsistent statement of Cruz offered to impeach his probable cause hearing testimony. We reject each of these claims.

## A

Cruz, who had testified at the probable cause hearing, could not be located at the time of the trial, despite what the trial court found had been reasonable and diligent efforts of the state.[23] Over the defendant's objection, the court admitted the transcript of the testimony that Cruz had given at the probable cause hearing.

The defendant mounts a two-pronged constitutional attack on the admission of Cruz' probable cause hearing testimony. He argues that the testimony was inadmissible under the federal constitutional confrontation clause[24] because it lacked sufficient indicia of reliability. He argues that the testimony was inadmissible under the state constitutional confrontation clause[25] because: (a) the death of the witness is the only form

---

[23] The defendant does not challenge this finding.

[24] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[25] The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

of unavailability recognized under the state right of confrontation; (b) the state constitutional requirements for indicia of reliability of the prior testimony ought to be more stringent than the federal requirements; and (c) those more stringent requirements were not satisfied in this case.

1

The defendant's federal constitutional claim is controlled by our decision in *State* v. *Outlaw*, 216 Conn. 492, 503–508, 582 A.2d 751 (1990). As in *Outlaw*, Cruz' prior testimony was given under oath, subject to criminal penalties for perjury; the testimony was given before a judicial tribunal that kept an accurate record of the proceedings; and the defendant was present in court and was represented by counsel. Id., 505. Furthermore, despite the defendant's claim to the contrary, the defendant had an adequate opportunity for cross-examination of Cruz at the probable cause hearing, and tested Cruz' direct testimony "with 'the equivalent of significant cross-examination.' " Id., 506; see also id., 508 (in order to satisfy indicia of reliability requirement, defendant's opportunity for cross-examination at probable cause hearing need not be equivalent to opportunity for cross-examination at trial).

The defendant argues that his opportunity for cross-examination of Cruz at the probable cause hearing was inadequate for two reasons: (1) his counsel was appointed immediately before the hearing began; and (2) the absence of a separate interpreter during the examination of Cruz rendered him unable to communicate with his counsel during that examination. We are not persuaded by either of these reasons.

Although it is true that the defendant's counsel was appointed to represent him immediately before the hearing began, and therefore, in the defendant's view, did not have time to investigate the case, his counsel

did not request a continuance, and at no time indicated that he was hampered in his cross-examination as a result of the timing of his appointment. Indeed, even with the benefit of hindsight, the defendant offers no evidence or line of inquiry that would have been pursued if there had been more time for investigation prior to the probable cause hearing. Furthermore, from our review of the transcript of the hearing, we can perceive no deficiencies in the cross-examination.

In objecting to the introduction at trial of the transcript of Cruz' prior testimony, the defendant's counsel contended that his opportunity for cross-examination of Cruz had been significantly limited because, at the prior hearing, he had not had access to Cruz' entire statement to the police. Thus, he argued, he did not have the opportunity to cross-examine Cruz about his illegal entry into the United States through Mexico, and about a certain statement by Cruz, discussed in more detail below, that he had dreamed that Herrera was hurt and bleeding. At trial, however, the defendant was able to establish, through the testimony of the police officer who had interviewed him, that Cruz had admitted entering the country illegally. Thus, to the extent that Cruz' illegal status in this country undermined his credibility, the jury had the benefit of knowledge of this fact in its deliberations, and the defendant was therefore not harmed by any inability to cross-examine Cruz on this issue at the probable cause hearing. Regarding Cruz' dream, the trial record indicates that, at the probable cause hearing, the defendant possessed the portion of Cruz' statement in which he referred to his dream. Thus, as the state accurately points out, the defendant was aware of that area of inquiry at the probable cause hearing and was not precluded from cross-examining Cruz about it at that time.

Regarding the defendant's contention that the absence of a separate interpreter flawed his counsel's

ability to cross-examine Cruz at the prior hearing, our reasoning articulated previously applies equally here. The record does not support his assertion that he was unable to communicate adequately with his counsel.

2

The defendant's state constitutional claim begins with his contention that, under article first, § 8, in order for the former testimony of a witness to be admissible in a subsequent trial, the unavailability of the witness can only be established by the death of the witness. The defendant's sole support for this contention is certain language in our decision in *State* v. *Brauneis*, 84 Conn. 222, 227, 79 A. 70 (1911).[26] The language on which the defendant relies, however, is dictum and, moreover, makes no reference to a constitutional basis for its purported statement of the law, nor is any other citation provided. Furthermore, if it was ever the law that unavailability could only be established by showing the death of the witness, our later case law indicates that former testimony may be admissible because of the unavailability of the witness under a wide variety of

---

[26] In *State* v. *Brauneis*, supra, 84 Conn. 222, the defendant and a codefendant were being tried for attempted rape. A witness had testified at a preliminary hearing that she had seen the defendant and the victim together, but at the time of the trial the witness was ill and was unable to be present. Id., 226–27. The codefendant offered the witness' prior testimony in his behalf. Although the state did not object, the defendant objected on the ground that it violated his right of confrontation. The court admitted the evidence as to the codefendant only, instructing the jury not to consider it as evidence against the defendant. Id., 227.

In rejecting the defendant's claim of error on appeal, this court stated: "Had the evidence been offered by the State against Brauneis, or against both defendants, the objection to it would have been properly taken. *The witness being alive, the State would have been required to produce her in court to testify, so that the defendant might be confronted by her and given an opportunity to cross-examine her.*" (Emphasis added.) Id. The court held, however, that, because the testimony had not been offered by the state and had not been admitted as evidence against the defendant, his right of confrontation had not been violated. Id.

circumstances. "The most common forms of unavailability are those set out in rule 804 (a) of the Federal Rules of Evidence. Rule 804 (a) lists five situations in which the declarant witness may be considered unavailable: (1) the court has determined that the witness has a testimonial privilege; (2) the witness persists in refusing to testify despite a court order to do so; (3) the witness has a lack of memory; (4) the witness is unable to be present or testify because of death or existing physical or mental illness or infirmity; and (5) the witness is 'absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . [or testimony] by process or other reasonable means.' " (Citation omitted.) *State* v. *Frye*, 182 Conn. 476, 481, 438 A.2d 735 (1980); *State* v. *Rivera*, 221 Conn. 58, 61, 602 A.2d 571 (1992); accord *State* v. *De Freitas*, 179 Conn. 431, 441, 426 A.2d 799 (1980); see also *State* v. *Ubaldi*, 190 Conn. 559, 572, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); *Atwood* v. *Atwood*, 86 Conn. 579, 584, 86 A. 29 (1913); *Mechanics Bank* v. *Woodward*, 74 Conn. 689, 693–94, 51 A. 1084 (1902). There is no evidence that the isolated statement in *Brauneis* was at the time considered to be a constitutional holding, and nothing since that time suggests the contrary.

We can perceive no sound reason for the limited construction of the unavailability requirement suggested by *Brauneis* under article first, § 8, of our state constitution. We have stated many times that the "Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." *State* v. *Dukes*, 209 Conn. 98, 115, 547 A.2d 10 (1988); *State* v. *Ross*, 230 Conn. 183, 248, 646 A.2d 1318 (1994); *State* v. *Miller*, 227 Conn. 363, 380, 630 A.2d 1315 (1993); *State* v. *DeFusco*, 224 Conn.

627, 632, 620 A.2d 746 (1993); *State* v. *Oquendo*, 223 Conn. 635, 649, 613 A.2d 1300 (1992); *State* v. *Lamme*, 216 Conn. 172, 183, 579 A.2d 484 (1990). In today's world, when people are undoubtedly more mobile than they were when our constitution was ratified in 1818, and therefore more likely to become unavailable, and when our technological modes of recording and preserving testimony are much more accurate than they were in 1818, it would be anomalous to preclude otherwise reliable former testimony of a witness who, although alive, is unavailable. We therefore reject the defendant's claim that, for purposes of the confrontation clause of article first, § 8, of the state constitution, Cruz' testimony was not admissible solely because the state had not established that he had died.

The second prong of the defendant's state constitutional claim is that, as a matter of state constitutional law, we "should hold that in determining the admissibility of preliminary hearing testimony, the trial court must examine all of the circumstances of the case to determine whether the prior testimony has sufficient indicia of reliability. In adopting this standard, the Court should depart from the *Roberts* [*Ohio* v. *Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)] Court's refusal to examine the inherent reliability or unreliability of the witness' story and the *Roberts* Court's decision to limit the reliability inquiry to the guarantees of trustworthiness in the accoutrements of the preliminary hearing itself." (Internal quotation marks omitted.)

The defendant's position is premised on somewhat of a misreading of *Roberts*. The court in *Roberts* did not limit the reliability inquiry, as the defendant asserts, to the inherent qualities of the preliminary hearing itself, namely, a properly preserved record of a judicial proceeding at which the defendant was represented by counsel, who had an opportunity to cross-examine

the witness, who had testified under oath. Instead, the court found it unnecessary to decide whether the *mere opportunity for cross-examination* at the prior hearing sufficed, because in that case the defendant's counsel "tested [the witness'] testimony with the equivalent of significant cross-examination." Id., 70. We have applied *Roberts* consistently with that view. See *State* v. *Outlaw,* supra, 216 Conn. 506.

It is true, however, that in *Roberts* the court eschewed an inquiry into "the inherent reliability or unreliability of [the witness'] story," relying on the inherent qualities of the prior hearing as a surrogate for such a judicial inquiry. *Ohio* v. *Roberts,* supra, 448 U.S. 73. Even if we were to assume, without deciding, that the confrontation clause of article first, § 8, requires such an inquiry, the defendant's argument fails because, rather than demonstrating that there was anything inherently unreliable about Cruz' testimony, he supports that argument simply by reasserting essentially the same factors on which he relied under his federal claim, namely, the lack of preparation time for the probable cause hearing, and the lack of a separate interpreter.

Thus, to the extent that the defendant argues that under article first, § 8, the court is required to determine whether Cruz' former testimony was "inherently unreliable," we decline to consider the claim because he has offered nothing to indicate such unreliability. To the extent that his argument is that, apart from a determination of inherent unreliability, there were insufficient affirmative indicia of reliability to satisfy article first, § 8, we decline to consider the claim because he offers the same indicia of reliability that we considered to be sufficient under the federal confrontation clause, and he has not claimed that article first, § 8, requires more in this regard.

## B

The defendant's final claim is that the trial court improperly excluded a statement by Cruz to Maldonado that he had dreamed that Herrera was injured and bleeding. The defendant offered this statement as a prior inconsistent statement to impeach Cruz' probable cause testimony that was introduced at the trial. This claim is without merit.

When the defendant offered this statement, the trial court exercised its discretion to exclude it on the ground that the defendant had had the statement available to him at the probable cause hearing and had failed to offer it for impeachment purposes at that time. We need not decide whether this was an appropriate basis for the exercise of the court's discretion, because we agree with the state that the statement was not inconsistent with any of Cruz' direct testimony. See *State v. Williams*, 220 Conn. 385, 395, 599 A.2d 1053 (1991).

The judgment is reversed and the case is remanded for a new trial.

In this opinion PETERS, C. J., and NORCOTT and HEIMAN, Js., concurred.

BERDON, J., concurring. I write separately because it may have been improper for the trial court to allow into evidence a transcript of the former testimony of Manuel Cruz. Indeed, under the circumstances of this case, I believe that the admission into evidence of Cruz' testimony, taken during the hearing in probable cause (hearing) of the defendant, Juan Munoz, may have violated the defendant's confrontation rights, as secured by the sixth and fourteenth amendments to the United States constitution.[1] Upon retrial, if the state attempts

---

[1] The sixth amendment to the United States constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the

to reintroduce Cruz' hearing testimony into evidence, the parties should establish a complete record in order to address this issue.

## I

In order to explore fully the issue of whether the hearing testimony of Cruz should have been admitted at the defendant's trial, it is first necessary to gain an understanding of what transpired during the hearing in probable cause.

Until the day of the hearing, the defendant was not represented by counsel. Immediately prior to the start of the hearing, assistant public defender Jerome Rosenblum met with the defendant and explained that he would serve as counsel if the defendant so desired. The defendant agreed, and the court appointed Rosenblum. Despite several indications that there was a language barrier,[2] the court did not appoint a separate interpreter to translate between defense counsel, who spoke

---

right . . . to be confronted with the witnesses against him . . . ." This provision applies to the states through the fourteenth amendment. *Pointer v. Texas*, 380 U.S. 400, 405, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[2] I am bewildered by the majority's *factual* conclusions that, "[a]t worst, [the defendant] spoke both Spanish and English, with English as his second language," and that the defendant was able to communicate with his attorney effectively and comprehend the hearing proceedings. As the defendant points out in his brief, everyone who came in contact with him believed that he needed an interpreter. All of the police officers who had spoken with the defendant said he needed one, and the defendant utilized the services of the interpreter whenever one was provided. The state acknowledged, before the hearing began, that the defendant needed one. State's attorney Bruce Hudock informed the court that he had arranged for "the interpreter to be here for purposes of—of interpreting for witnesses. I did not ask the interpreter I brought in to be the defendant's personal interpreter." Later, he added that, "I'm just letting the court know that the state did not arrange for a personal interpreter for the defendant." Finally, the court concluded that the defendant required an interpreter. It is axiomatic that even a person who is merely deficient in the English language should be provided with an interpreter when he is facing criminal charges, in order to facilitate effective communication between the defendant and his attorney.

primarily English,[3] and the Hispanic defendant, who spoke primarily Spanish.[4]

The hearing began moments later, before defense counsel had any opportunity to investigate the basis for the state's case against his new client. Cruz was the fourth witness of the morning called by the state. He testified in Spanish, and the court interpreter translated his testimony into English. Cruz testified as follows: He drove his rented black Chevrolet Cavalier to the victim's house at approximately 10:10 p.m. on the night of the victim's murder, picked up the victim and drove a short distance before encountering another car. The victim got out of Cruz' car and went to talk with a person or persons in the other car. He then returned to Cruz' car, said he was going to the beach and told Cruz to meet him later. The victim then got into the other car and drove away. Cruz testified that he never saw the victim again.

At the conclusion of the state's examination of Cruz, and before beginning cross-examination, defense counsel asked the court for permission to review the statement Cruz had given to police during their investigation. The court, citing General Statutes § 54-46a,[5] noted that the

---

[3] The transcript of the hearing does not reveal that defense counsel knew any Spanish whatsoever. Seven months later, however, during the trial of the defendant, defense counsel informed the court that "I know a little bit of Spanish . . . ."

[4] Because of the important constitutional rights that are implicated, a trial judge has an obligation to canvass the defendant in order to determine whether he needs an interpreter. "The least we can require is that a court, put on notice of a defendant's severe language difficulty, make unmistakably clear to him that he has a right to have a competent translator assist him, at state expense if need be, throughout his trial." *United States ex rel. Negron* v. *New York*, 434 F.2d 386, 390–91 (2d Cir. 1970). An appellate court should not be faced with a silent record and be required to guess at the defendant's degree of proficiency with the English language. See footnote 2.

[5] General Statutes § 54-46a (b) provides in relevant part that "[n]o motion . . . for discovery shall be allowed in connection with such hearing. . . ."

defendant's counsel was not entitled to discover any of the state's evidence against the defendant unless that evidence tended to be exculpatory. The court then indicated that it would review the statement over lunch and, if it found any statements therein to be exculpatory, it would provide them to defense counsel after the luncheon recess.

During the recess, the court reviewed the five page statement that Cruz had provided to the police one month earlier. The court concluded that of 125 typewritten lines of text, eleven lines were "questionable" and, therefore, could be turned over to defense counsel. Among these "questionable" statements was Cruz' explanation to police why he had looked for the victim the day after leaving him in the street. According to the statement, Cruz had "had a dream that something happened" to the victim, and that "in my dream [the victim] was hurt, I saw him bleeding. I can't remember in my dream where it was." The defendant's counsel, who was provided with a photocopy of this statement moments before beginning his cross-examination of Cruz, did not ask Cruz about it.

After Cruz left the witness stand, a subsequent witness offered testimony that suggested Cruz might have played a more important role in the chain of events leading to the victim's murder. Stamford police detective Peter diSpagna testified at the probable cause hearing that the defendant, in speaking with police about what had happened the night of the victim's murder, had implicated the driver of a black Chevrolet Cavalier—the same model Cruz had said he was driving. According to diSpagna, the defendant had arranged to meet the driver of the black Cavalier to complete a drug transaction. When the defendant decided not to go through with the deal, however, the driver of the black car instructed the victim to get out and "teach [the defendant] a lesson." According to the defendant's

statement to diSpagna, the victim got out of the car and pulled a knife on the defendant. The defendant fought off the victim's blows, recovered the knife, stabbed the victim *once*, and fled the scene. According to this version of events, at the time that the defendant last saw the victim, the victim was with the driver of the black Chevrolet Cavalier and was suffering from only *one* stab wound. According to the autopsy report, however, the victim died after suffering *twenty-seven* stab wounds. Because Cruz had already testified, however, defense counsel did not have an opportunity to ask Cruz about the defendant's version of events.[6]

## II

The trial court concluded that a transcript of Cruz' testimony was admissible under the "former testimony" exception to the hearsay rule. See generally C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.4, pp. 325–30. It is settled, however, that the confrontation clause of the United States constitution may operate to bar the admission of evidence that otherwise qualifies under this common law hearsay exception.

In *Ohio* v. *Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), the United States Supreme Court made clear that the confrontation clause ordinarily envisions "a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the

---

[6] The accused does not have a right to present evidence at a hearing in probable cause unless, after the court finds probable cause based upon the state's rendition of evidence, (1) the defendant makes a specific offer of proof, including the names of witnesses who would testify or produce the evidence offered, and (2) the court then determines that such evidence would be sufficient to rebut its finding of probable cause. General Statutes § 54-46a (b).

stand and the manner in which he gives his testimony whether he is worthy of belief. *Mattox* v. *United States,* [156 U.S. 237, 242–43, 15 S. Ct. 337, 39 L. Ed. 409 (1895)]. These means of testing accuracy are so important that the absence of proper confrontation at trial calls into question the ultimate integrity of the fact-finding process. *Chambers* v. *Mississippi,* 410 U.S. 284, 295, 93 S. Ct. 1038, 1046, 35 L. Ed. 2d 297 (1973), quoting *Berger* v. *California,* 393 U.S. 314, 315, 89 S. Ct. 540, 541, 21 L. Ed. 2d 508 (1969)." (Internal quotation marks omitted.) *Ohio* v. *Roberts,* supra, 63–64.

The court in *Roberts* announced a two part test for determining whether former testimony may be admitted without infringing a criminal defendant's right of confrontation.[7] "That test requires (1) demonstration that the witness is unavailable to testify at trial, and (2) adequate indicia of reliability of the previous testimony." *State* v. *Williams,* 231 Conn. 235, 248, 645 A.2d 999 (1994). In this case, neither party disputes the unavailability of Cruz, who could not be located at the time of trial. Rather, the parties disagree whether Cruz' testimony at the hearing in probable cause bore adequate indicia of reliability in order to protect the defendant's rights when the state attempted to introduce a transcript of the testimony during the defendant's trial.

---

[7] In *Ohio* v. *Roberts,* supra, 448 U.S. 66, the United States Supreme Court's precise holding was that, "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears 'adequate indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." As this court noted in *State* v. *Outlaw,* 216 Conn. 492, 505, 582 A.2d 751 (1990), "[b]y engaging in a search for 'particularized guarantees of trustworthiness' in *Roberts,* the United States Supreme Court implicitly held that the exception to the hearsay rule for statements given by an unavailable declarant at a preliminary hearing was not so firmly rooted as to obviate further inquiry and search of the record."

Specifically, the parties disagree whether the defendant had an adequate opportunity to cross-examine Cruz about his testimony during the hearing in probable cause.

The United States Supreme Court has recognized that a key factor in determining whether former testimony bears "adequate indicia of reliability" is whether the declarant was subject to cross-examination during the former proceeding. See *Ohio* v. *Roberts*, supra, 448 U.S. 69–70; *California* v. *Green*, 399 U.S. 149, 160–61, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970).[8] Indeed, this

---

[8] The United States Supreme Court has never addressed the issue of how much cross-examination is enough—that is, at what point the mere opportunity for cross-examination or the extent of the cross-examination itself may serve as an adequate badge of reliability. In *Ohio* v. *Roberts*, supra, 448 U.S. 70, for example, the court expressly left open this question, concluding that it did not need to decide whether the mere opportunity for cross-examination or de minimis questioning would be sufficient. The court did, however, imply that this requirement would be satisfied if the declarant was subjected to "the equivalent of significant cross-examination" at the former hearing; id.; and if the defendant's counsel "was not significantly limited in any way in the scope or nature of his cross-examination." (Internal quotation marks omitted.) Id., 71.

At a hearing in probable cause, however, the defendant's counsel is "significantly limited." A hearing in probable cause is a limited hearing with a limited purpose. General Statutes § 54-46a; see footnote 6. The defendant's counsel is severely limited in his right to discover information; see footnote 5; and this limitation can work to hinder his ability to conduct an effective cross-examination. As counsel for the defendant argued at trial, in opposition to the introduction of Cruz' hearing testimony: "[T]he object of a hearing in probable cause is exactly that: to determine probable cause. It's not a trial on the merits. The counsel for the accused is limited in his ability to cross-examine the witness because of a statute which does not allow for discovery. . . . [O]rdinarily, when a witness testifies, I'm entitled to his statement and I can use the statement for whatever purpose I see fit. In a hearing in probable cause, I am not entitled to that statement.

"[W]hat . . . actually happened in the hearing, was that [the trial court] reviewed the statement of the witness and culled out two small parts of it as being exculpatory, and then sealed the balance of the statement.

"So my point I'm making is that because of the limits of a hearing in probable cause, you don't have full confrontation under the due process clause. The test of offering our prior testimony when someone is not available is: Was the defendant represented by counsel? Did he have an

court has stated that, in order to satisfy the defendant's right of confrontation, the declarant at the former hearing must have endured "the equivalent of significant cross-examination"; *State* v. *Williams,* supra, 231 Conn. 249; *State* v. *Outlaw,* 216 Conn. 492, 506, 582 A.2d 751 (1990); and that the cross-examination must have "comported with the principal *purpose* of cross-examination: to challenge whether the declarant was sincerely telling what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed by the language he employed." (Emphasis in original; internal quotation marks omitted.) *State* v. *Outlaw,* supra, 506.

Under the circumstances of this case, I am concerned that the defendant may have lacked the opportunity at the hearing in probable cause to engage in a cross-examination of Cruz that satisfied these constitutional requirements. In my view, four interrelated factors may have combined to produce this result: (1) a public defender was appointed to represent the defendant only moments before the start of the hearing, when he had no opportunity whatsoever to investigate the state's case against his new client; (2) the absence of a separate interpreter to translate between the defendant and his attorney, thereby hindering their ability to communicate effectively during the hearing;[9] (3) the fact that

opportunity to cross-examine? In other words, were the confrontation requirements of the United States constitution met? And I would submit that they're not under Connecticut procedure with regard to a hearing in probable cause, because defense counsel is limited, and limited in a very important way, in not having the full statement of the witness available."

[9] If a criminal defendant requires an interpreter to allow him to communicate with his attorney and to comprehend the court proceedings, the state violates that defendant's constitutional rights if it fails to provide one. See generally *State* v. *Roman,* 224 Conn. 63, 71, 616 A.2d 266 (1992) (*Berdon, J.,* dissenting), cert. denied, 507 U.S. 1039, 113 S. Ct. 1868, 123 L. Ed. 2d

only a portion of Cruz' statement to police was made available to defense counsel during the hearing, and only moments before the defendant was expected to begin cross-examining Cruz; and (4) defense counsel could only have become aware of the possible greater importance of Cruz after he had testified, when diSpagna took the stand and recounted the defendant's story of the black Chevrolet Cavalier.

In these respects, this case is very different than *State* v. *Outlaw*, supra, 216 Conn. 492. In *Outlaw*, the defendant's attorney had time to prepare for the hearing and to ready his cross-examination questions. There was no language barrier that made communication between attorney and client difficult or that required multiple interpreters for witnesses and the defendant. Finally, in *Outlaw*, there was no indication that the trial court declined to provide the defendant access to witness information, such as the statement Cruz had given to the police in this case.

488 (1993). The specific rights implicated are the rights to confrontation, to due process and to counsel. *United States ex rel. Negron* v. *New York*, 434 F.2d 386, 389 (2d Cir. 1970).

"It is axiomatic that the Sixth Amendment's guarantee of a right to be confronted with adverse witnesses, now also applicable to the states through the Fourteenth Amendment . . . includes the right to cross-examine those witnesses as an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. . . . But the right that was denied [the defendant] seems to us even more consequential than the right of confrontation. Considerations of fairness, the integrity of the fact-finding process, and the potency of our adversary system of justice forbid that the state should prosecute a defendant who is not present at his own trial . . . unless by conduct he waives that right. . . . And it is equally imperative that every criminal defendant—if the right to be present is to have meaning—possess sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. . . . Otherwise, [t]he adjudication loses its character as a reasoned interaction . . . and becomes an invective against an insensible object." (Citations omitted; internal quotation marks omitted.) Id. Whether these rights can be waived by the attorney for the defendant, or only by the defendant himself after a canvass by the court, I leave to another day. See id.

Moreover, I believe this case underscores two important, additional considerations that are implicated whenever testimony from a hearing in probable cause is sought to be admitted for substantive use during a later criminal trial: the effect of this state's prohibition on discovery in connection with a hearing in probable cause; see General Statutes § 54-46a (b); and the vital importance of having effective representation at such a hearing.

First, the prohibition on criminal discovery in connection with probable cause hearings puts great pressure on defense counsel to communicate with their clients and to make whatever preliminary investigations they can in order to assess the relative strength or weakness of the state's case and the likely roles of the witnesses who will testify at the hearing. In this instance, for example, the state's case was paper-thin, and Cruz played an important part in linking the defendant to the murder. Cruz's testimony that the victim told him he was going to the beach—an area near where the victim's body eventually was found—was necessary to place the victim near that location and, therefore, to lessen the possibility that he had died elsewhere. If the victim had not died in the beach area, his assailant would have had to transport his body to that area—and the defendant's car revealed no physical evidence that he had undertaken such a task.

Second, this case underscores the importance of a defendant having effective representation at the probable cause hearing. As this case points out in dramatic fashion, the testimony elicited at such a hearing is not necessarily limited to that hearing or to the hearing's limited purpose of determining whether the state has sufficient proof to go forward with a trial on the merits. Rather, the testimony elicited at a hearing in probable cause has the potential to be carved in stone, and used by the state for substantive proof during later pro-

ceedings. Defense attorneys must be aware of these possibilities, and must conduct themselves at such hearings with these consequences in mind.

On the basis of the record before us, I have serious reservations about the admissibility during the trial of Cruz' hearing testimony. Nevertheless, because we are reversing his conviction on other grounds and remanding this case for a new trial, I need not make this determination at this time. If the state offers Cruz' testimony into evidence during the new trial,[10] the defendant will have an opportunity to establish whether he is in fact prejudiced by the admission of the former testimony, and to preserve his claims of error under both the federal and the state constitutions.

---

[10] Of course, in order for the state to introduce Cruz' hearing testimony during the new trial, it will once again need to prove that he is unavailable.